341 F.2d 383
 UNITED STATES for the Use of FIRST CONTINENTAL NATIONAL BANK & TRUST COMPANY, LINCOLN, NEBRASKA, a Corporation, and First Continental National Bank and Trust Company, Lincoln, Nebraska, a Corporation, Appellants,
v.
WESTERN CONTRACTING CORPORATION, a Corporation, The Aetna Casualty and Surety Company, a Corporation, Standard Accident Insurance Company, a Corporation, Fireman's Fund Insurance Company, a Corporation, Hartford Accident & Indemnity Company, a Corporation, The Travelers Indemnity Company, a Corporation, Argonaut Insurance Co., a Corporation, and Globe Indemnity Company, a Corporation, Appellees.
 No. 17742.
 United States Court of Appeals Eighth Circuit.
 February 17, 1965.
 
 Flavel A. Wright, of Cline, Williams, Wright, Johnson, Oldfather & Thompson, Lincoln, Neb., made argument for appellants and filed brief.
 Robert L. Berry, and George L. DeLacy, Omaha, Neb., of Kennedy, Holland, DeLacy & Svoboda, Omaha, Neb., made argument for appellees except Globe Indemnity Co., and filed brief.
 William C. Hastings, of Chambers, Holland, Dudgeon & Hastings, Lincoln, Neb., made argument for Globe Indemnity Co., and filed brief.
 Before VAN OOSTERHOUT, BLACKMUN and MEHAFFY, Circuit Judges.
 VAN OOSTERHOUT, Circuit Judge.
 
 
 1
 This is an appeal by plaintiff First Continental National Bank & Trust Company, Lincoln, Nebraska, hereinafter called plaintiff or Bank, from final judgment dismissing its three count complaint. Defendants named in count one are Western Contracting Corporation, prime contractor with the Government on certain Nebraska missile sites projects, and Aetna Casualty and Surety Company, Standard Accident and Insurance Company, Fireman's Fund Insurance Company, Hartford Accident and Indemnity Company, and The Travelers Indemnity Company, sureties on its performance bond given pursuant to the Miller Act, 40 U.S.C.A. § 270a et seq. The defendant in count two is Argonaut Insurance Co., surety on a performance bond given to Western Contracting Corporation by Hansen-Kashner Co. (hereinafter H. K.), subcontractor on the missile site project. The defendant in count three is Globe Indemnity Company, surety on a Banker's Blanket Bond which it sold and issued to the Bank.
 
 
 2
 H. K. maintained a checking account in plaintiff bank which it used largely to pay for labor and material bills on the project. In November 1960 three checks aggregating $55,000 drawn by H. K. upon its California bank account were dishonored. Such checks had been shown as a deposit when received by plaintiff bank, and H. K. checks drawn to pay for project material and labor were honored by the plaintiff prior to the clearing of the deposited checks. A loss of $58,331.70 resulted when the deposited checks amounting to $55,000 were returned unpaid.
 
 
 3
 Jurisdiction on count one, based upon federal statutes is established. Jurisdiction exists on counts two and three based upon diversity of citizenship and the requisite amount.
 
 
 4
 The same legal principles control the disposition of the appeal as to counts one and two. The defendants involved in such counts include all defendants except Globe. For simplicity in this opinion, the word defendants will be used to describe and include all defendants except Globe. When Globe is involved, it will be specifically named.
 
 
 5
 It would appear that federal law controls with relation to the count one Miller Act bond and that Nebraska law controls as to the count two bond furnished the contractor by the subcontractor. No claim is made that federal law here materially differs in any respect from Nebraska law, nor do we find any basis for distinction. We shall consider the issues relating to the first two counts together.
 
 
 6
 Each of the bonds clearly provides for the protection of persons furnishing labor or material for the project. No provision is made either expressly or by reasonable implication for the protection of persons extending credit or loaning money to the contractor or the subcontractor.
 
 
 7
 In denying relief under a Miller Act bond to a person who furnished materials or credit to a supplier who provided them for the project, the Supreme Court in MacEvoy Co. v. United States, etc., 322 U.S. 102, 107, 64 S.Ct. 890, 893, 88 L.Ed. 1163, stated:
 
 
 8
 "The Miller Act, like the Heard Act, is highly remedial in nature. It is entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects. Fleisher Engineering [& Construction] Co. v. United States, 311 U.S. 15, 17, 18 [61 S.Ct. 81, 82, 83, 85 L.Ed. 12]; cf. United States [to Use of Noland Co.] v. Irwin, 316 U.S. 23, 29, 30 [62 S.Ct. 899, 902, 86 L.Ed. 1241]. But such a salutary policy does not justify ignoring plain words of limitation and imposing wholesale liability on payment bonds."
 
 
 9
 The Court then goes on to say that the right to recovery on a bond is limited to materialmen, laborers and subcontractors who deal directly with the prime contractor or who have direct contractual relationship with a subcontractor, and then observes: "To allow those in more remote relationships to recover on the bond would be contrary to the clear language of the proviso and to the expressed will of the framers of the Act." 322 U.S. 102, 108, 64 S.Ct. 890, 894.
 
 
 10
 The Nebraska court places a similar construction upon performance bonds of the type involved here. W. T. Rawleigh Co. v. Smith, 142 Neb. 527, 7 N.W.2d 80, 9 N.W.2d 286, 287; Hopewell v. McGrew, 50 Neb. 789, 70 N.W. 397, 399.
 
 
 11
 Plaintiff does not contend that it is directly covered by the bonds. Instead, it claims that it is subrogated to the rights of laborers and materialmen whose claims were paid by H. K. checks drawn upon and paid by plaintiff bank. Defendants' answer to such contention is that one who loans or advances money to a contractor or a subcontractor to pay for labor or material is not subrogated to the rights of the laborers or materialmen whose claims have been paid with the proceeds of the loan or advancement.
 
 
 12
 The facts are stipulated and undisputed. H. K., after entering into the subcontract, established an account of $2,000 with the bank. This deposit, like most of the subsequent deposits, was in the form of a check drawn by H. K. against its account in the Bank of America at Fresno, California. At the time of the initial deposit, H. K. was permitted to draw checks of $200 upon its account without waiting for the deposited checks to clear. Subsequently nineteen deposits aggregating some $147,000 were made to the H. K. account. While no express agreement was made permitting H. K. to draw unlimited amounts against uncollected deposits, the bank statement in evidence indicates that the Bank repeatedly honored checks drawn against uncollected deposits. H. K.'s account in plaintiff bank was overdrawn subsequently on a number of occasions prior to the time in controversy but such checks were taken care of by a deposit within a few days.
 
 
 13
 The first dishonored check here involved, which amounted to $25,000, was dated November 3 and deposited November 5. The overdraft at that time was $6,730. Additional deposits of $10,000 on November 7, $10,000 on November 9 and $20,000 on November 12 were made. After crediting such deposits and before charging back the dishonored checks, the H. K. account in plaintiff bank as of November 16 shows an overdraft of $3,454. The $10,000 check of November 7 was paid. The other three checks, aggregating $55,000, were dishonored upon presentation. The Bank learned of the nonpayment of the deposited checks on November 18. Thereupon the account was promptly closed and payment was demanded from H. K. for $58,331.70. Such payment was never made. Western Contracting Corporation furnished the subcontract work which H. K. was unable to complete for lack of funds.
 
 
 14
 The checks paid by plaintiff were at least largely for labor and material on the project. All were paid in the ordinary course of business. Some 90% of the checks were cashed at banks other than plaintiff or at business establishments. It is stipulated "there was no conversation, discussion or written or verbal agreement, of any and relating to any assignment by the payees of said checks to the plaintiff bank of any rights or claims the payees thereof had. * *"
 
 
 15
 It is also stipulated that the Bank itself did not furnish any labor or material for the project and that there was no discussion or agreement between plaintiff and H. K. that the plaintiff in honoring the checks would be assigned any rights the payees might have had.
 
 The trial court found inter alia:
 
 16
 "Plaintiff extended to Hansen-Kashner the privilege of writing checks on the deposited checks before it was ascertained that they would or would not be accepted and paid by the drawee bank in California.
 
 
 17
 * * * * * *
 
 
 18
 "We are unable to follow the theory espoused by the use plaintiff. It is our opinion that although the extension of credit or the allowance of the privilege of writing checks before final clearance of the deposited checks is not a formal loan evidenced by a note with agreed interest and possibly some collateral, it is a transaction in the nature of a loan, perhaps more properly termed an advancement of money.
 
 
 19
 * * * * * *
 
 
 20
 "There has been no assignment of the claims in this case. If any agreement existed it was solely between the bank and the subcontractor. The laborers were not informed of any agreement that was made and had no knowledge of it."
 
 
 21
 Such findings are supported by substantial evidence, much of which has been heretofore set out. In applying the law to such findings, the court states:
 
 
 22
 "It is the generally accepted view that one who loans or advances money to another for the purpose of meeting a payroll and paying for supplies cannot sue a surety who has guaranteed payment to those furnishing labor and materials. The basic reason for such decisions is that the agreement between the surety and the contractor does not go that far. The supplying of money is not equivalent to or synonymous with the furnishing of labor and materials even if the money supplied is used in payment for such labor and materials. The surety has agreed not to hold the contractor free and protected from all claims or indebtedness but only to protect the people supplying labor and material from nonpayment. When they have been paid, all rights inhering in them and through them are extinguished since there is no longer any need to protect them."
 
 
 23
 Such appears to be a proper statement of the law. Courts have generally held that one who loans or advances money to a contractor to pay for labor or material is not protected by a performance bond of the type here involved. Bank of Auburn v. United States Fid. & Guar. Co., 5 Cir., 295 F.2d 641, 642; Village of Cambridge, Ill., for Use and Benefit of Shilling v. Hartford Acc. & Indem. Co., 7 Cir., 253 F.2d 599, 600; First Nat'l Bank of Chisholm v. O'Neil, 176 Minn. 258, 223 N.W. 298; Howard County v. Pesha, 103 Neb. 296, 172 N.W. 55; Carr Hardware Co. v. Chicago Bonding & Sur. Co., 190 Iowa 1320, 181 N.W. 680; see Anno. 127 A.L.R. 974.
 
 
 24
 Carr Hardware, supra, closely resembles our present case factually. The court there denied subrogation, stating:
 
 
 25
 "Colloquially expressed, the construction company said to the intervener:
 
 
 26
 "`My home is in Mexico, Mo. I have money there in a bank. I haven't any cash in Ames to pay my labor. Will you accept my check on my home bank, give me credit on your books, and honor my labor pay roll?'
 
 
 27
 "The bank answered, `I will.' It did.
 
 
 28
 "One who loans or advances money to a contractor to pay for labor or material for an improvement is not entitled to a mechanic's lien upon the improvement or to recover upon the contractor's bond; nor is such person subrogated to the rights of the laborers or materialmen whose claims are paid with the money. United States [to Use of Fidelity Nat. Bank] v. Rundle, 107 Fed. 227, 46 C.C.A. 251, 52 L.R.A. 505; Hardaway v. National Surety Co., 211 U.S. 552, 29 Sup.Ct. 202, 53 L.Ed. 321; Godeffroy v. Caldwell, 2 Cal. 489, 56 Am.Dec. 360." 181 N.W. 680, 682.
 
 
 29
 In United States to Use of Fidelity Nat. Bank v. Rundle, 9 Cir., 107 F. 227, 228-229, 52 L.R.A. 505, the court in denying subrogation observes:
 
 
 30
 "Nor can it be claimed that the law will raise a presumption of an assignment upon the facts in the case. It is true that an assignment may in some cases be made by parol, and that under certain circumstances the presumption will arise that an assignment was intended solely from the nature of the transaction. But in the circumstances of the present case we discover nothing upon which to rest such a presumption. The agreement was wholly between the contractor and the bank. The laborers and the material men were not parties to it. They took their checks and their orders to the bank as directed, and were there paid. The checks and orders were indorsed as evidences of payment, and for no other purpose, and the bank retained them as vouchers. In this there was no assignment."
 
 
 31
 To like effect, see First Nat'l Bank of Chisholm v. O'Neil, supra; 50 Am.Jur., Subrogation § 45; 83 C.J.S. Subrogation § 41; United States to Use of Norfolk R. Co. v. D. L. Taylor Co., E.D.N.C., 268 F. 635, aff'd 277 F. 945; Anno. 127 A.L.R. 974, 989, 164 A.L.R. 783, 786.
 
 
 32
 Plaintiff places considerable reliance upon Nebraska Nat'l Bank of Hastings v. Bruning, 114 Neb. 719, 209 N.W. 510. While some language in such case lends some support to plaintiff's position, the case is distinguishable and not controlling here. A claim against a statutory bank guarantee fund is there involved.
 
 
 33
 Moreover, the Bank in paying the checks was acting as a volunteer. The Bank was under no obligation to extend credit to H. K. by permitting H. K. to draw checks upon uncollected deposits. It was not aware of the bonds and hence could not have relied upon such bonds. The Bank had no arrangement or understanding with either H. K. or the laborers or materialmen for acquisition of their rights. It would appear that the Bank in extending credit relied upon the validity of the deposited checks and the credit of H. K. The Bank had no lien or interest in the project to protect.
 
 
 34
 One who makes payment as a volunteer is not entitled to subrogation. Henningsen v. United States Fid. & Guar. Co., 208 U.S. 404, 411, 28 S.Ct. 389, 52 L.Ed. 547; Freeport Motor Cas. Co. v. McKenzie Pontiac, Inc., 171 Neb. 681, 107 N.W.2d 542, 545; Annos. 127 A.L.R. 974, 989, 164 A.L.R. 782, 786.
 
 
 35
 We recognize that subrogation is an equitable remedy which is somewhat flexible. We are, however, convinced that the trial court properly denied subrogation in this case, particularly since the granting of subrogation would result in stretching the coverage of the bonds beyond their clearly defined limits. The court properly dismissed counts one and two.
 
 
 36
 The situation with respect to the count three claim is quite different. Liability in such count is based exclusively upon a Banker's Blanket Bond issued to plaintiff by Globe. Such bond provides coverage so far as here material against: "(B) Any loss of Property through robbery, burglary, common-law or statutory larceny, theft, false pretenses, hold-up, misplacement, mysterious unexplainable disappearance, * * *" Globe is the only defendant directly involved in count three. Liability upon the bond is predicated upon the theory that H. K. obtained the money which it paid out by its checks by false pretense.
 
 
 37
 The bond does not define the term "false pretenses." It seems clear that the coverage of an item such as false pretenses is at least as broad as the criminal definition of the term. Fidelity & Casualty Co. of New York v. Bank of Altenburg, 8 Cir., 216 F.2d 294; Pioneer Valley Savings Bank v. Indemnity Ins. Co., N.D.Iowa, 225 F.Supp. 404, 408; Kropp Forge Co. v. Employers' Liab. Assur. Corp., 7 Cir., 159 F.2d 536, 537.
 
 
 38
 There are cases which hold that false pretenses in the bond means false pretenses either under the ordinary meaning of the term or under local criminal statutory definition. Pioneer Valley Savings Bank, supra. We need not, however, for purposes of our case, go beyond the criminal definition.
 
 
 39
 The parties agree that Nebraska law controls as to this count. The pertinent Nebraska statutes appearing under the heading of false pretenses include:
 
 Section 28-1207:
 
 40
 "Obtaining money, goods, chattels, real property by false pretenses; penalty. Whoever (1) by false pretense or pretenses, or by a promissory representation as to some future action to be taken by the person making the representation where made with the present intent that such future action would not be performed or carried out, shall obtain from any other person, corporation, association or partnership, any money, goods, merchandise, credit or effects whatsoever with intent to cheat or defraud such person, corporation, association, or partnership of the same; * * * shall be imprisoned in the penitentiary not more than five years nor less than one year; * *."
 
 Section 28-1213:
 
 41
 "Insufficient-fund checks and assignment of funds; drawing, uttering; penalties. Any person who, with intent to defraud, shall make or draw, utter or deliver any check, draft, assignment of funds or order for the payment of money upon any bank, cooperative credit association or other depository knowing, at the time of such making, drawing, uttering or delivering, that the maker or drawer has not sufficient funds in, or credit with, such bank, cooperative credit association or other depository for the payment of such check, draft, order or assignment of funds in full upon its presentation, shall upon conviction be punished as follows: * * * [Penalty if check is more than $35 is fine or imprisonment not exceeding 7 years or both.]"
 
 Section 28-1214:
 
 42
 "Insufficient-fund checks and assignment of funds; rules of evidence; presumptions; protest; notice of dishonor.
 
 
 43
 "* * * [T]he making, drawing, uttering or delivering of a check, draft, order or assignment of funds, payment of which is refused by the drawee because of lack of funds or credit, shall be presumptive evidence of intent to defraud and of knowledge of insufficient funds in, or credit with such bank, * * *."
 
 
 44
 No Nebraska case has been cited specifically labeling § 28-1213 as a false pretense statute. However, such statute is part of the chapter entitled "False Pretenses." Moreover, where the check is for over $35, as it is here, the offense is a felony.
 
 
 45
 Other courts have held similar bad check statutes to be false pretense statutes. The Iowa Supreme Court, in dealing with statutes very similar to those of Nebraska, in Humphrey v. Hollowell, 203 Iowa 221, 212 N.W. 570, 571, quotes from State v. Marshall, 202 Iowa 954, 211 N.W. 252, as follows:
 
 
 46
 "`Section 13047 seems to cover completely those cases of false pretense wherein the pretense consists in presenting a check upon a bank where knowingly sufficient funds are not on deposit to meet the same. * * *'"
 
 And then goes on to say:
 
 47
 "The false pretense which is denounced in this section is that pretense that funds are on deposit in the hands of the drawee of the check sufficient to meet the check when presented. * * *"
 
 
 48
 To like effect, see Tartar v. Commonwealth, 267 Ky. 502, 102 S.W.2d 971, 972; Malkemus v. State, 174 Tenn. 547, 129 S.W.2d 201, 202; 35 C.J.S. False Pretenses § 21b(2).
 
 
 49
 The trial court as a basis for its dismissal of count three states:
 
 
 50
 "It is our opinion that the mere deposit of nonsufficient fund checks, with nothing more, does not amount to false pretenses. The wording of the bond itself indicates that the bank is to be protected from activities which in the main amount to criminal actions. False pretenses, in our mind, connotes a fraudulent scheme or device by which someone is induced to give credit or part with money. The doing of such an onerous act is not easily presumed. In all fairness to the parties concerned, it would seem to be necessary that some fraud be actually established. There is no indication in the facts stipulated before us that there was any such activity on the part of Hansen-Kashner."
 
 
 51
 The record conclusively shows that $55,000 in H. K. checks deposited in plaintiff's bank were dishonored for lack of funds. Proof of presentment for payment, nonpayment, and protest is uncontested. Under § 28-1214 the nonpayment of such checks created a rebuttable presumption of intent to defraud and knowledge of insufficient funds or credit in such bank. We find in the record no substantial evidence to rebut the presumption. There is no testimony or proof that the dishonored checks were issued inadvertently without knowledge that H. K. had insufficient funds to cover them. Nor is there any testimony that H. K. had any arrangement with the Bank for the payment of such checks. On the contrary, the statement of H. K.'s account in the California bank for the period from October 31, 1960, to November 18, 1960, shows a maximum credit balance during such period of $11,631. While $35,000 was deposited on November 3, prior to such deposit the account was overdrawn $22,768. From November 11 on, the account continuously shows overdrafts exceeding $15,000. There was nothing approaching adequate funds in the H. K. account in the California bank at any time during the month of November to cover the $25,000 H. K. check deposited on November 5, or the $20,000 H. K. check deposited on November 12.
 
 
 52
 There can be no question that the giving of the checks constituted a representation that the checks were good. Such representation was relied upon by the Bank in permitting H. K. to draw on uncollected funds. The unrebutted presumption of § 28-1214 establishes evidence of intent to defraud and knowledge of insufficient funds or credit to take care of the checks. The loss resulted from the false pretense. The basic error committed by the trial court on this ground is its failure to give recognition to the rebuttable presumption created by § 28-1214. We are satisfied that the transactions fall within the false pretense coverage of the blanket bond executed by Globe.
 
 
 53
 On oral argument, Globe raised the contention that the loss resulted from nonpayment of a loan and hence coverage was excluded under the bond by exclusion clause § 1(d) reading:
 
 
 54
 "THIS BOND DOES NOT COVER:
 
 
 55
 * * * * * *
 
 
 56
 "(d) Any loss the result of the complete or partial nonpayment of or default upon any loan made by or obtained from the Insured, whether procured in good faith or through trick, artifice, fraud or false pretenses, * * *."
 
 
 57
 Globe raised such defense in its answer. The trial court did not reach and hence did not rule upon such defense. Globe has not raised or discussed this issue in its briefs. While we have some doubt whether this issue is properly before us, we have chosen to consider it.
 
 
 58
 In answering a similar contention, this court in Hartford Acc. & Indem. Co. v. Federal Deposit Ins. Corp., 8 Cir., 204 F.2d 933, 936-937, states:
 
 
 59
 "The fact that Schneier was obligated to reimburse the Bank because of having induced it to accept the worthless checks for credit to his account and to permit him to draw against the credit, did not, in our opinion, make the loss sustained by the Bank a loss resulting from the nonpayment of a loan, within the ordinary meaning of that word as applied to banking or insurance.
 
 
 60
 * * * * * *
 
 
 61
 "It is not conceivable to us that any disinterested banker, insurance underwriter, or lawyer would construe the word `loan', as used in the exclusion clause of this indemnity bond, to cover the obligation imposed by law to reimburse a bank for money or credit obtained through the use of worthless checks."
 
 
 62
 We re-affirmed this view in Fidelity & Casualty Co. of N. Y. v. Bank of Altenburg, 8 Cir., 216 F.2d 294, 304. Such cases are controlling here. See also Pioneer Valley Savings Bank v. Indemnity Ins. Co., supra, pending before us on appeal. In that case, the court discusses expert testimony received at the trial bearing upon whether bankers regarded a transaction such as this a loan and concludes the transaction is not a loan.
 
 
 63
 In the light of the authorities just discussed, we cannot say as a matter of law that the Bank, by permitting H. K. to draw on uncollected deposits, made H. K. a loan within the meaning of such term as it is used in the bond.
 
 
 64
 The judgment dismissing counts one and two is affirmed. The judgment dismissing count three as to Globe is reversed and this case is remanded to the District Court for a new trial on count three.