378 F.2d 62
 UNITED PACIFIC INSURANCE CO., Appellant,
v.
The IDAHO FIRST NATIONAL BANK, Appellee.
The IDAHO FIRST NATIONAL BANK, Cross-Appellant,
v.
UNITED PACIFIC INSURANCE CO., Cross-Appellee.
 No. 21097.
 United States Court of Appeals Ninth Circuit.
 May 11, 1967.
 
 1
 Dale Clemons, Clemons, Skiles & Green, Boise, Idaho, for appellant and cross-appellee.
 
 
 2
 J. Dennis Faucher, W. E. Sullivan, Langroise, Clark & Sullivan, Boise, Idaho, for appellee and cross-appellant.
 
 
 3
 Before JERTBERG and MERRILL, Circuit Judges, and MATHES, District judge.
 
 MATHES, District Judge:
 
 4
 This appeal and cross-appeal are from separate portions of a judgment of the District Court following trial without a jury of a diversity action brought by appellee bank to recover on two claims under appellant's 'Bankers Blanket Bond, Standard Form No. 24'.
 
 
 5
 The bank's complaint on the bond contains three counts: In count I claim is asserted for recovery of the bank's admitted $10,484.46 loss arising from alleged 'false pretenses' made to the bank in connection with transactions involving drafts of Gem Creamery Company, plus costs, and attorneys' fees pursuant to Idaho Code 41-1839. In count II claim is asserted for recovery of the bank's admitted $2,987.35 loss arising from alleged 'false pretenses' made to the bank in connection with transactions surrounding the cashing of a purported cashier's check of The First National Bank of San Angelo, Texas, plus costs, and attorneys' fees pursuant to Idaho Code 41-1839. In count III claim is asserted for the same loss as in count II, but here it is alleged that the bank's loss was due to the purported cashier's check being a written instrument 'which prove(d) to have been counterfeited'.
 
 
 6
 The requisite jurisdictional amount in controversy is present as to counts II and III, by reason of aggregation of all claims, which in each instance arose in favor of and are owned by the same plaintiff, and are asserted against the same defendant. (See: 28 U.S.C. 1332; Edwards v. Bates County, 163 U.S. 269, 16 S.Ct. 967, 41 L.Ed. 155 (1896); Crawford v. Neal, 144 U.S. 585, 13 S.Ct. 759, 36 L.Ed. 552 (1892); Kimel v. Missouri State Life Ins. Co., 71 F.2d 921 (10th Cir. 1934).)
 
 
 7
 The District Court found in favor of the bank on the claim asserted in count I, and in favor of the insurer on the claims asserted in counts II and III. The insurer has appealed from that portion of the judgment involving count I, and the bank has filed a cross-appeal from that portion of the judgment adverse to the claims asserted in counts II and III.
 
 The Insurer's Appeal
 
 8
 As to the issues involved in count I of the complaint, the trial court made the following findings of fact which are fully supported by the evidence:
 
 
 9
 On or about September 1, 1961, the insurer executed in favor of the bank a 'Bankers Blanket Bond, Standard Form No. 24', whereby the insurer became bound, in an amount not exceeding one million dollars, to hold the bank harmless from losses specified in the bond.
 
 
 10
 In January 1962, at Emmett, Idaho, one F. Worley and one D. Doramus, as co-partners, began operation of a business known as Gem Creamery Company. At the Emmett, Idaho, office of the First Security Bank or Idaho, Gem Creamery Company established the company's checking account, and adopted the practice of purchasing milk, butter, eggs, and the like, by the use of sight drafts drawn by Gem Creamery Company on itself and made payable through the First Security Bank of Idaho at Emmett. In the handling of these drafts, the course of business was that, at the end of each day, the bank gave Gem Creamery Company information as to the total amount of drafts that had been presented for payment during the day, and the company would then draw one check payable to the First Security Bank of Idaho for the amount necessary to honor the drafts.
 
 
 11
 During the period from mid-1962 until about February 22, 1963, Gem Creamery Company drew sight drafts several times weekly in increasing numbers, payable to various employees of the company, and gave the drafts to the payee-employees with instructions to cash the drafts and return the money to the company. The payee-employees did regularly cash the drafts at various banks and business establishments throughout southwestern Idaho, and returned the proceeds to the company. Occasionally the payee-employees cashing the drafts represented that the drafts were drawn in payment for services performed for the company. Throughout the period under discussion, all Gem Creamery Company drafts presented for payment through the First Security Bank of Idaho at Emmett were regularly honored.
 
 
 12
 During this period, both the Capital office and the Broadway office of appellee bank at Boise, Idaho, cashed in the ordinary course of business numerous sight drafts drawn by Gem Creamery Company and made payable to employees of that company. Appellee always presented these drafts for payment through the First Security Bank of Idaho at Emmett, and the drafts were always honored upon presentment until the fateful day of February 25, 1963, when a number of them, signed on behalf of Gem Creamery Company by one of the partners, were dishonored; and as a result appellee bank suffered a net loss of $10,484.46.
 
 
 13
 On April 19, 1963, an involuntary petition in bankruptcy was filed against Gem Creamery Company; and the gross amount derived from the assets of the company found by the receiver-trustee in bankruptcy amounted to only $1,753.47.
 
 
 14
 By the practices adopted in the handling of the drafts, Gem Creamery Company impliedly represented to appellee bank and others that the drafts, later dishonored, were issued in the ordinary course of company business; that the company had funds or credit with the Emmett bank to assure payment; and that the drafts would be honored upon presentment. In fact, of course, the drafts were not issued in the ordinary course of company business, and the company did not have funds or credits necessary to honor the drafts.
 
 
 15
 In dealing with the drafts, appellee believed and relied upon the false representations and pretenses of Gem Creamery Company, and the bank's loss was caused by such reliance upon such false pretenses. Appellee gave timely notice to the insurer of the loss, as required by the bond, and filed proof of loss and claim therefor; but appellant denied that the loss was covered by the bond.
 
 
 16
 Appellee bank retained attorneys to prosecute this action on the bond, and agreed to pay a reasonable attorneys' fee, which the trial court found was $2,000.00 for the prosecution of appellee's claim under count I.
 
 
 17
 The bond in suit provides, inter alia: 'The Losses Covered by This Bond Are As Follows:
 
 
 18
 '(b) Any loss of property through * * * false pretenses * * *.'
 
 
 19
 The District Court found and concluded that appellee bank's $10,484.46 loss on the drafts was caused by 'false pretenses', within the above-quoted provisions of insuring clause (B) of the bond. Accordingly, taking into account the $1,000 'deductible' provided as to losses under insuring clause (B), the trial court rendered judgment in favor of appellee bank and against appellant insurer for $11,484.46, being the amount of the loss claimed in count I, less the $1,000 deductible, plus $2,000 for attorneys' fees pursuant to Idaho Code 41-1839.
 
 
 20
 Appellant insurer assigns as error certain of the findings of fact, but the gist of the insurer's first contention upon appeal is that 'a draft does not constitute false pretenses'; that 'the false pretense must relate to a present existing or to a past fact.'
 
 
 21
 The phrase 'false pretenses' is not defined in the bond, but appellee urges that the words should be given their everyday meaning; and that, when so taken and understood, the methods adopted by Gem Creamery Company in dealing with the drafts constituted 'false pretenses'-- more particularly the methods of issuing and cashing the drafts in what purported to be the ordinary course of the company's business, not only at appellee bank, but also at places of business throughout the community, such as grocery stores, drugstores, and the like.
 
 
 22
 One of the claimed errors specified by the insurer is the admission of evidence as to the cashing of Gem Creamery Company drafts at places of business other than appellee bank. We think this evidence was correctly received to show the ordinary course of business in the community in the handling of the drafts. And in our opinion the District Court correctly found and held, under the circumstances at bar, that the issuing and cashing of the drafts carried the implied representation and pretense to the business community at large, and to appellee bank in particular, that the drafts were issued in the ordinary course of the business of Gem Creamery Company, and that the company had, or would have upon presentment for payment, sufficient funds on deposit with the Emmett bank to assure that the drafts would be duly honored.
 
 
 23
 These representations were false beyond question; for, as already pointed out, the drafts were not issued in the ordinary course of business; and it is equally evident that when the dishonored drafts were issued the company had no reasonable expectation that they would be honored upon presentment. Such false representations unquestionably fall within the meaning of 'false pretenses' as employed in insuring clause (B) of appellant's bond. (See: Indemnity Ins. Co. v. Pioneer Valley Savings Bank, 343 F.2d 634 (8th Cir. 1965); United States for Use of First Continental Nat. & Trust Co. v. Western Contracting Corp., 341 F.2d 383 (8th Cir. 1965); Fidelity and Casualty Co. v. Bank of Altenburg, 216 F.2d 294 (8th Cir. 1954); Hartford Accident & Ind. Co. v. Federal Deposit Ins. Corp., 204 F.2d 933 (8th Cir. 1953); Pioneer Valley Savings Bank v. Indemnity Ins. Co., 225 F.Supp. 404 (N.D.Iowa 1964).)
 
 
 24
 Appellant insurer, however, draws attention to the fact that the coverage of insuring clause (B) of the bond is made expressly subject to certain 'conditions and limitations', among which is the following:
 
 
 25
 'Exclusions
 
 
 26
 'Section 1. This Bond Does Not Cover:
 
 
 27
 '(a) Any loss effected directly or indirectly by means of forgery * * *.'
 
 
 28
 Appellant next urges that the dishonored drafts which brought loss to appellee bank were forgeries within this exclusion clause. We are concerned here, of course, not with the crime of forgery, but with the meaning of the word as used in the bond; and the bond does not define 'forgery'. Specifically, the insurer's contention is that the false pretenses of Gem Creamery Company in dealing with the drafts in question amounted to a 'forgery' of the drafts within the meaning of the exclusion clause just quoted.
 
 
 29
 It may indeed be correct to say that a forgery necessarily connotes a false pretense; but that is far from saying that every false pretense is a forgery (Cf.: First National Bank of South Carolina v. Glens Falls Ins. Co.,304 F.2d 866 (4th Cir. 1962); State Bank of Poplar Bluff v. Maryland Cas. Co., 289 F.2d 544, 548 (8th Cir. 1961).)
 
 
 30
 To us it is clear, then, that the learned trial judge was correct in holding that appellee bank's loss on the drafts was a 'loss of Property through * * * false pretenses' within insuring clause (B) of the bond; and that the loss was not excluded from coverage as a 'forgery' within exclusion clause 1(a).
 
 The Bank's Cross-Appeal
 
 31
 As to the issues involved in counts II and III of the complaint, the trial court found that:
 
 
 32
 On or about February 10, 1964, a woman giving the name of Clara Perkins deposited with the Lewiston, Idaho, branch of cross-appellant bank an instrument purporting to be a cashier's check drawn on and issued by The First National Bank of San Angelo, Texas. Cross-appellant bank cashed the check, and as a result of this transaction suffered a loss of $2,987.35.
 
 
 33
 The purported cashier's check was not on a printed form of 'cashier's check' used by the Texas bank, but was on a printed form of 'counter check' which had been made to appear to be a cashier's check of the Texas bank. The name 'James C. Bolton', written in ink in the lower right-hand corner of the check over the printed words 'Authorized Signature', was not the name of any person who had ever been an officer or employee of the Texas bank. Nor was the purported 'cashier's check' in fact an instrument issued by The First National Bank of San Angelo, Texas.
 
 
 34
 These findings of fact are supported by the evidence; and the trial court concluded therefrom that the bank's loss was 'effected directly or indirectly by means of forgery', and hence was expressly excluded from coverage by the provisions of above-quoted exclusion clause 1(a) of the bond. The trial court thereupon rendered judgment dismissing counts II and III upon the merits.
 
 
 35
 The uncontradicted evidence shows that in order to gain the bank's confidence prior to presenting the purported cashier's check, 'Clara Perkins' had opened a checking account with a small deposit, and represented that her husband was an agent with the Internal Revenue Service who had been transferred recently from Boise to Lewiston. At the time she presented the 'cashier's check', the woman stated that the check constituted proceeds from the sale of a house in Texas, and that she needed $3,000 in cash to apply on the purchase of a home in Lewiston.
 
 
 36
 Upon this cross-appeal, the bank urges reversal upon two grounds, contending: first, that the bank's loss on the 'cashier's check' was not due to 'forgery' within exclusion clause 1(a), but that the dealings leading up to the honoring of the 'cashier's check' made the bank's loss a 'loss of Property through * * * false pretenses' within the coverage of insuring clause (B); and second, that the purported cashier;s check was a 'counterfeit instrument' within the coverage of insuring clause (E) of the bond.
 
 
 37
 That cross-appellant bank was induced by 'false pretenses' to cash the check is too plain to require discussion; so the loss on the check was within the coverage of insuring clause (B), unless excluded because the check was a 'forgery'.
 
 
 38
 In this diversity action, the law of Idaho governs. (Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).) And the burden of proof rested upon cross-appellee insurer to establish by a preponderance of the evidence that the bank's loss on the 'cashier's check' was excluded from coverage under insuring clause (B) as a 'forgery' within exclusion clause 1(a). (Cities Service Oil Co. v. Dunlap, 308 U.S. 208, 60 S.Ct. 201, 84 L.Ed. 196 (1939); O'Neil v. New York Life Insurance Co., 65 Idaho 722, 152 P.2d 707 (1944).) This means that it was incumbent upon the insurer to overcome the disputable presumption that the signature 'James C. Bolton' was genuine. (See: Uniform Commercial Code 3-307(1)(b) and Official Code Comment; News Notes, 35 U.S. Law Week 2533 (3/14/67).) The record before us does not reveal any attempt on the part of the insurer to meet that burden.
 
 
 39
 Our decision that the bank's loss on the check was a 'loss of Property through * * * false pretenses', within the coverage of insuring clause (B), would make it unnecessary to consider cross-appellant's second contention that the loss was in all events caused by a 'counterfeit' instrument within insuring clause (E), but for the trial court's dismissal of count III of the complaint on the merits.
 
 
 40
 Insuring clause (E) provides for coverage of 'Any loss through the insured's having, in good faith and in the course of business, * * * accepted or * * * given any value * * * on the faith of, or otherwise acted upon securities, documents, or other written instruments which prove to have been counterfeited or forged as to the signature of any maker, drawer, issuer * * * EXCLUDING, HOWEVER, and loss through FORGERY OR ALTERATION of, on or in any checks, drafts, * * *.'
 
 
 41
 The undisputed facts were such as to being the bank's loss on the 'cashier's check' within the coverage of insuring clause (E) as a 'counterfeit' instrument; and the burden was upon cross-appellee insurer to establish that the bank's loss was 'through FORGERY OR ALTERATION of, on or in' a check, within the above-quoted exclusion contained in insuring clause (E). The result is that it was incumbent upon the insurer to show either that the signature James C. Bolton was forged, or that the 'cashier's check' was 'altered' after it became an existing instrument. Changes made in a blank printed form would not constitute an 'alteration' within the exclusion. (See: Uniform Commercial Code 3-407; Uniform Negotiable Instruments Law 14, 124.)
 
 
 42
 As we have already noted, the insurer failed, indeed made no attempt, to establish any of the facts surrounding the drawing or making and uttering of the 'cashier's check' at bar. There was no evidence as to whether one James C. Bolton did or did not sign the instrument, but the disputable presumption is that he did. (See: Uniform Commercial Code 3-307(1)(b) and Official Code Comment.) If one James C. Bolton signed his own name, the signature would not be a 'forgery' even though in signing he falsely pretended to represent someone that he did not in fact represent. See: Tiarks v. First National Bank of Mobile, 279 Ala. 100, 182 So.2d 366 (1966); Bank of Detroit v. Standard Accident Ins. Co., 245 Mich. 14, 222 N.W. 134 (1928).) The trial court's finding that the check was a 'forgery' was, therefore, 'clearly erroneous'. (Fed.R.Civ.P. 52(a); United States v. United States Gypsum Co., 333 U.S. 364, 394-395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).)
 
 
 43
 But the insurer urges that 'counterfeit' and 'forged' are used synonymously in insuring clause (E), and that as a consequence a 'counterfeited' check is excluded from coverage as a 'forgery'. In Fidelity Trust Co. v. American Surety Co., 268 F.2d 805 (3rd Cir. 1959), the court held that 'forged' and 'counterfeited' in insuring clause (E) do not mean the same thing, observing:
 
 
 44
 'Argument for the surety companies urges the point that the word 'or' between the word 'counterfeited' and the word 'forged' indicates the use of different terms to express the same thing. That means, necessarily, that the word 'counterfeited' could just as well be left out for it adds nothing to the term 'forged'.
 
 
 45
 'We do not think this is the best construction of the instrument. The form was offered as a contract by large professional surety companies who certainly know what they are doing. We cannot think that it has not been very carefully drafted or that the draftsman put in words to mean nothing. Furthermore, this language is that of the promisor who is doing professional business for a consideration. The bond contained in the record is a printed form submitted by the surety company. If there is doubt about the meaning of language under those circumstances, it is not to be resolved in favor of the one who chose the words and as a business transaction issued the bond to another. Its very term 'Blanket Bond' indicates that its coverage is to be wide and it is not unfair to interpret the document in this fashion. * * *
 
 
 46
 'Both sides have referred us to many dictionary definitions of 'counterfeit.' Dictionary definitions are useful, of course. But in a business transaction we think that the use of the words is to be taken in accordance with common business usage as much as possible. We think that common usage would indicate that counterfeit is something that purports to be something that it is not.' (268 F.2d at 807; see also State Bank of Poplar Bluff v. Maryland Cas. Co., 289 F.2d 544 (8th Cir. 1961).)
 
 
 47
 We agree. A 'counterfeit' instrument is one that 'purports to be something that it is not'. Under the provisions of the bond in suit, a forged instrument is ex necessitate a 'counterfeit' instrument; but a 'counterfeit' instrument need not necessarily involve a forgery within insuring clause (E).
 
 
 48
 For the reasons stated, the bank's loss on the 'cashier's check' was covered, not only under insuring clause (B) as a loss through 'false pretenses', but also under insuring clause (E) as a loss due to the bank's having acted upon a written instrument which proved to have been 'counterfeited'.
 
 
 49
 Accordingly, that portion of the judgment appealed from in favor of the bank on count I will be affirmed; and that portion of the judgment in favor of the insurer on counts II and III will be reversed, and the cause remanded for further proceedings not inconsistent with this opinion.
 
 
 50
 The bank has presented to us a motion for an award of attorneys' fees under Idaho Code 41-1839, covering services rendered in this Court upon this appeal. (See Zurich Ins. Co. v. Sigourney, 278 F.2d 826 (9th Cir. 1960).)
 
 
 51
 The bank will be awarded costs upon the appeal and the cross-appeal, but the motions for attorneys' fees for services rendered upon the appeal and the cross-appeal will be committed for hearing and determination by the trial court.