424 F.2d 312
 The FIRST NATIONAL BANK OF DECATUR, a National Banking
Corporation, formerly, the National Bank of
Decatur, Plaintiff-Appellee,
v.
INSURANCE COMPANY OF NORTH AMERICA, a Foreign Corporation,
Defendant-Appellant.
 No. 17778.
 United States Court of Appeals, Seventh Circuit.
 March 16, 1970, Certiorari Denied June 1, 1970, See 90 S.Ct.
1844.
 
 Jack E. Horsley, Mattoon, Ill., Frank L. Eisele, Philadelphia, Pa., Robert E. O'Keeffe, Peoria, Ill., of counsel, Richard F. Record, Jr., and Donald E. Castles of Craig & Craig, Mattoon, Ill., for appellant.
 Vernon H. Houchen, Richard C. McDonald of Wilson, Dyar, Houchen & McDonald, Decatur, Ill., for appellee.
 Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and CUMMINGS, Circuit Judge.
 HASTINGS, Senior Circuit Judge.
 
 
 1
 Plaintiff First National Bank of Decatur, Illinois (Decatur) brought this diversity action in the district court against defendant Insurance Company of North America (INA) seeking recovery under a Bankers' Blanket Bond issued by defendant. Decatur asserts that a loss it suffered as the result of an alleged check kiting scheme is covered by the bond issued by INA. On the basis of evidence presented during a bench trial and an agreed stipulation of facts, written briefs and oral argument, the trial court entered judgment adverse to INA in the amount of $88,442.64. INA appeals. We affirm.
 
 
 2
 The losses on which this suit are based arose out of the hectic and unsuccessful scramble of a failing corporation to save itself from financial ruin. Community Industries, Limited (Community) began as the local business of a small religious sect[1] in the early 1930's in Sullivan, Illinois during the 'Great Depression.' It grew until, in 1964, it had assets of approximately $3,800,000.00 and about 400 employees. Community suffered severe losses in the recession of 1957-1958. Business improved after that for a time, but in 1963 the corporation again suffered substantial losses due to 'much more severe' competition and uninsured fire losses. It managed to continue with the aid of capital invested by many of its factory workers who mortgaged 'what they could.' But apparently its position continued to deteriorate, particularly from January through March, 1966. On April 22, 1966, Community filed proceedings for an arrangement under Chapter XI of the federal Bankruptcy Act and has since been dissolved.
 
 
 3
 For several years prior to 1966, Community had maintained a checking account with Decatur. This account was used mainly for payroll deposits and the drawing of payroll checks. During this same period, Community maintained a checking account at the National Bank of Mattoon, Illinois (Mattoon). This was its general account used for payment of its accounts. Community also maintained a checking account in the State Bank of Arthur, Illinois (Arthur). This account was relatively inactive until late in 1965. Early in 1966, Community opened a checking account in the First City National Bank of New York (First City). The purpose of this account was to speed the flow of funds from Sam Levitt in New York, Community's major customer, to Community in Illinois.
 
 
 4
 Levitt came to Community's attention in June, 1965, through James Talcott, Inc., (Talcott) a nationwide private commercial banking company which had been financing Community's receivables. An agreement was negotiated between Levitt and Community whereby approximately 80% Of Community's production would go to Levitt. Levitt then began advancing funds on an informal and unsecured basis to get Community into production. Community would telephone Levitt and advise him of its current production run and of the amount of money required. Levitt would then deposit funds in Community's First City account. Community would draw checks on its account with First City and deposit them in its Arthur account. It would then draw checks on its Arthur account and deposit them in its Mattoon account. Finally, it would draw checks on its Mattoon account and deposit them in its Decatur account. The cash flow between these accounts increased 50% From January to February, 1966 and further increased until March 18, 1966, when the banks stopped paying Community's checks.
 
 
 5
 All three Illinois banks had been allowing Community to draw checks against uncollected deposits. On or about March 18, 1966, Decatur discovered for the first time, through a telephone call to Mattoon, that the checks on Mattoon which Community had been depositing in Decatur were not covered by funds in Mattoon when such deposits were made, but were covered only after being presented for payment at Mattoon. It appears that for some time it had been a daily practice for Mattoon to notify Community of the amount needed to cover all of Community's checks presented for payment, including those received from Decatur. Community would then send a courier to Mattoon with a list of those checks to be paid and funds to cover them. Other of such checks would be returned unpaid.
 
 
 6
 Upon learing this, Decatur stopped paying Community's checks drawn on it and returned them unpaid. It closed Community's account on March 26, 1966. At about the same time, Community's accounts at Mattoon and Arthur were seized by those banks. Upon final adjustment of Community's accounts at these three banks, each showed a negative balance as follows: Arthur-- $97,720.00; Matton-- $117,779.93; and Decatur-- $106,068.53. The total amount was $321,568.46.
 
 
 7
 Through various adjustments with Community and after settling its claim in the Chapter XI arrangement proceeding, Decatur was left with a loss of $74,730.70. This amount plus Decatur's reasonable attorneys' fees in the Chapter XI proceeding plus interest make up the amount of the judgment rendered in its behalf in the instant action against its insurer INA.
 
 
 8
 Decatur maintains that the loss it suffered due to Community's activities is covered by Bankers' Blanket Bond, Form No. 24, issued to it by INA and in effect at all times relevant herein. Specifically, coverage is claimed under coverage (B) of the bond, which reads, in applicable part, as follows:
 
 
 9
 'ON PREMISES
 
 
 10
 (B) Any loss of Property through robbery, burglary, common-law or statutory larceny, theft, false pretenses, hold-up, misplacement, mysterious unexplainable disappearance, damage thereto or destruction thereof, whether effected with or without violence or with or without negligence on the part of any of the Employees, and any loss of subscription, conversion, redemption or deposit privileges through the misplacement or loss of Property, while the Property is (or is supposed to be) lodged or deposited within any offices or premises located anywhere, except in any of the Insured's offices hereinafter excluded or in the mail or with a carrier for hire, other than an armored motor vehicle company, for the purpose of transportation. * * *
 
 
 11
 The trial court concluded 'Insuring Clause B of the Bond is applicable in the instant case, for the reason that the facts shown * * * constitute false pretenses under the law of Illinois.' The court relied on a number of Eighth Circuit cases holding that check kiting is a form of false pretenses and on the following Illinois statute:
 
 
 12
 'A person commits a deceptive practice when: * * *
 
 
 13
 (d) With intent to obtain control over property or to pay for property, labor or services of another, he issues or delivers a check or other order upon a real or fictitious depository for the payment of money, knowing that it will not be paid by the depository. Failure to have sufficient funds or credit with the depository when the check or other order is issued or delivered is prima facie evidence that the offender knows that it will not be paid by the depository. * * *' Ill.Rev.Stats., Ch. 38, Sec. 17-1.
 
 
 14
 The Committee Comments note that 'Section 17-1 is designed to cover a great variety of deceptive practices previously proscribed by a large number of sections in Illinois * * * (including) false pretenses * * *.'
 
 
 15
 INA attacks the decision of the trial court in several respects. Some of these merit only brief consideration. First INA claims that coverage (B) invoked here 'covers only tangible, 'touchable', physically corporeal property and the loss of Plaintiff does not qualify.' The bond contains a lengthy definition of 'property' and includes in that term, among other things, the following: acceptances, bank notes, bills of exchange, bonds, certificates, checks, currency, drafts, evidences of debts, insurance policies, assignments of insurance policies, money, mortgages, receipts, rights, and withdrawal orders. We find this list broad enough to include intangible as well as tangible property.
 
 
 16
 The identical question and definition were before the Eighth Circuit in Fidelity and Casualty Company of New York v. Bank of Altenburg, 8 Cir., 216 F.2d 294, 304 (1954). It said: 'The bond was to cover banking operations. The losses covered were very broad. * * * 'It is not conceivable to us that any disinterested banker, insurance underwriter, or lawyer would construe' this bond as not covering assets of the bank lost through a 'check kiting' scheme practiced upon it.' Citing Hartford Accident & Indemnity Co. v. Federal Deposit Ins. Corp., 8 Cir., 204 F.2d 933 (1953). In National Bank of Paulding v. Fidelity and Casualty Company, 131 F.Supp. 121 (S.D.Ohio 1954), the court said, at 124: 'The check kiter) obtained a credit to his account in the plaintiff bank which he was able to check out in the form of money. Property is defined in these bonds to 'mean money." It may be worthy of note that this bond has been revised since the decision of these cases and the insurer has made no effort to further restrict the definition of property.
 
 
 17
 A second contention is that the transactions between Decatur and Community constituted loans which are specifically excluded from the coverage of Bankers' Blanket Bond, Form No. 24. The record shows that Community had sought secured loans from Decatur during the period of January 1 to March 18, 1966, and was refused. It is unlikely, then, that Decatur intended to make open-ended, unsecured loans to Community by allowing it credit against deposits that were not only uncollected but not even covered by funds in the drawee bank. A loan implies an agreement, a meeting of the minds. Mildly stated, it does not comport with the usual understanding to say that every time one person wrongfully obtains property from another and thus becomes legally obligated to restore it, he has succeeded in obtaining a loan from his victim. In the words of the Eighth Circuit: 'It is not conceivable to us that any disinterested banker, insurance underwriter, or lawyer would construe the word 'loan', as used in the exclusion clause of this indemnity bond, to cover the obligation imposed by law to reimburse a bank for money or credit obtained through the use of worthless checks.' Hartford Accident, supra, 204 F.2d at 937.[2]
 
 
 18
 INA further contends that Decatur 'failed to exercise elementary, commercial 'good faith' and is precluded from recovery on that basis.' In support of this, INA claims that Decatur knew of Community's shaky financial position and continued to honor its checks against uncollected deposits. However, our reading of the record convinces us that Decatur did not know that the uncollected checks it was honoring were drawn on an account without funds which depended on deposits from yet another account containing only uncollected deposits.
 
 
 19
 We do not find it commercially unreasonable for a bank to honor drafts against the uncollected deposits of an old and established customer. There was testimony to this effect by the former president of Decatur, the senior vice president of Mattoon and an officer of Arthur, which the trial judge apparently credited. While Decatur may have known something of Community's financial difficulties, we are not persuaded that it knew or reasonably should have known that such difficulties had pressed an apparently respected corporation into activities that amount to a violation of the criminal law of Illinois. As soon as it learned facts which gave a hint of such activity, it froze Community's account. Accordingly, we hold that Decatur is not precluded from a recovery on the instant bond on the ground that it failed to exercise commercial good faith.
 
 
 20
 INA further urges that the trial court erred 'in failing to consider all of the relevant evidence presented regarding definition of certain controlling terms' in its bond. INA produced an expert witness who had been involved in drafting and revising the bond. He gave his opinion concerning the meaning of certain terms in the bond. He said that he believed that a number of court decisions interpreting the bond were in error. All of this evidence was heard subject to Decatur's objection. There is no record showing that the court ruled on the objection. We shall assume that the trial court considered the challenged testimony and related exhibits insofar as they were relevant and persuasive.
 
 
 21
 We have also considered this evidence and concluded that the trial court simply disagreed with INA's expert. Likewise, we do not find it persuasive. A number of decisions in courts of other jurisdictions have considered the same bond that is now before us as it relates to losses resulting from conduct similar to that of Community.[3] These decisions are contrary to the interpretation espoused by INA's expert.
 
 
 22
 INA's expert further testified concerning the method of drafting the bond in question. He stated that it resulted from a joint effort of organizations representing both the insurance and the banking industries. INA contends that in light of this testimony it was error for the trial court to apply the usual rule that ambiguities in an insurance policy will be construed against the insurer responsible for drafting the policy. We disagree. The substance of the 'joint effort' appears to be that the American Bankers Association was consulted for its suggestions after the insurance companies drafted the bond. The last revision of this bond relevant herein was in 1961. It can hardly be said that when Decatur purchased the bond in 1965, it had so actively participated in drafting it that it should be denied the benefit of the usual rule. At very least the burden to prove that it had so participated was on INA and it failed to carry it with the testimony of its expert. First National Bank of Fort Walton Beach v. United States Fidelity and Guaranty Co., 5 Cir., 416 F.2d 52, 56 (1969).
 
 
 23
 INA strenuously urges that even if all of its previously discussed contentions are rejected, still it must prevail because Community's activities do not amount to 'false pretenses' within the bond's coverage. It first argues that in order to recover under the bond Decatur must show by 'clear and convincing evidence' that Community was guilty of violating the criminal law of Illinois.
 
 
 24
 Whether 'false pretenses' in the bond covers more or less than the criminal law depends on what the contracting parties intended it to cover. See Kropp Forge Co. v. Employers' Liability Assur. Corp., 7 Cir., 159 F.2d 536, 538 (1947). At least one court has held that 'false pretenses' in this bond covers more than the criminal law definition of that term. Pioneer Valley Savings Bank v. Indemnity Ins. Co. of North America, 225 F.Supp. 404, 408 (N.D.Iowa 1964), aff'd, 343 F.2d 634, supra. We need not decide the exact scope of the term here. It is at least clear that the term as used in the bond is as broad as the criminal definition of false pretenses. Western Contracting, supra, 341 F.2d at 388. INA concedes this. It is our opinion, as more fully set out below, that Community's activities in the instant case fall within the Illinois deceptive practices statute, Ill.Rev.Stats., Ch. 38, Sec. 17-1, supra, and thus come within the clear scope of the bond.[4]
 
 
 25
 In Esquire Restaurant, Inc. v. Commonwealth Ins. Co. of New York, 7 Cir., 393 F.2d 111, 114 (1968), we held that Illinois requires only a preponderance of the evidence to prove a criminal act in a civil case. INA relies upon Sprague v. Dodge, 48 Ill. 142 (1868), which it asserts we did not consider in Esquire, for the proposition that Illinois requires clear and convincing evidence in such a case. However, in Esquire we relied upon Sundquist v. Hardware Mutual Fire Ins. Co. of Minnesota, 371 Ill. 360, 365, 21 N.E.2d 297, 300, 124 A.L.R. 1375 (1939), wherein the Illinois court specifically overruled 'Rost v. Noble and Co. (316 Ill. 357, 147 N.E. 258 (1925)), and the cases therein cited * * *.' Among the cases cited and relied upon by Rost was Sprague. Thus we conclude that the law of Illinois is that announced in Sundquist requiring proof of a criminal act in a civil case by only a preponderance of the evidence.
 
 
 26
 Finally, we turn to the substance of INA's contention that the activities of Community here in question do not amount to a violation of the Illinois criminal statute. INA asserts that Community has not been shown, even by a preponderance of the evidence, to have had the required 'intent to defraud' when it issued checks to Decatur against insufficient funds. In Illinois, as elsewhere, some wrongful intent is regarded as a necessary element of fraud. See, e.g., Dahlke v. Hawthorn, Lane & Co., 36 Ill.2d 241, 245, 222 N.E.2d 465, 467 (1966). In the current Illinois deceptive practices statute this element is required by the words 'knowing that it (the issued check) will not be paid.' In the predecessor statute[5] to present Section 17-1, supra, the required wrongful intent was denominated 'intent to defraud.' In both statutes it is provided that issuing a check which, at the time of issuance, is not covered by sufficient funds is prima facie evidence of the required 'knowledge that it will not be paid' or 'intent to defraud.'
 
 
 27
 We are not persuaded by the argument of INA that an 'intent to defraud' and 'knowing it (the check) will not be paid' are two separate elements of the crime defined in Section 17-1. Admittedly, when a check is issued with the knowledge of both parties that it will not be paid until some agreed upon future date at which time the drawer will deposit funds to cover it, there is no statutory intent to defraud.[6] We have no such situation in the instant case. While Decatur had established a practice of honoring Community's checks drawn on it against uncollected deposits, yet as we have hereinabove determined, there is no evidence that Decatur had agreed to honor such checks when Community had no funds in Mattoon to cover its uncollected deposits in Decatur. Further, the record is quite clear that Decatur did not know that such checks were issued when Community had insufficient funds in Mattoon to cover them. Thus we conclude that the statute, Section 17-1, supra, raises a rebuttable presumption that Community had the requisite wrongful intent in issuing these checks.
 
 
 28
 INA contends that such presumption has been rebutted by a showing that when Community issued the checks against its insufficient Mattoon account, it entertained a reasonable expectation that sufficient funds would be deposited in time to pay the checks when they were presented. No Illinois case has been cited, and we have found none, holding that such an expectation is a defense to a prosecution under Section 17-1 and its predecessors. However, several other jurisdictions which have considered the question have sustained such a defense. See, e.g., Williams v. United States, 9 Cir., 278 F.2d 535, 537 (1960); United States v. Broxmeyer, 2 Cir., 192 F.2d 230, 233 (1951); and People v. Rubin, 223 Cal.App.2d 825, 36 Cal.Rptr. 167, 9 A.L.R.3d 707 (1963). See also Annotation, 'Reasonable Expectation of Payment as Affecting Offense under 'Worthless Check' Statutes,' 9 A.L.R.3d 719. We shall assume arguendo that Illinois courts would follow these cases if the question were presented to them.
 
 
 29
 The asserted reasonable expectation of Community was based upon its alleged reliance on Levitt and Talcott to cover its overdrafts. We have carefully reviewed the entire record of the relationship and past business dealings among Community, Levitt and Talcott, which is reflected in the following resume.
 
 
 30
 Talcott had apparently been financing Community's receivables for some time. Normally, it would advance 85% Of the net invoice value. When, in June of 1965, Community was in need of additional funds to get into production, Talcott refused to 'officially' increase this percentage advance but told Community to issue checks for necessary materials and that Talcott would undertake to cover them when they were presented.
 
 
 31
 A few months later, in the fall of 1965, Community entered into a contract with Levitt to manufacture lawn mowers on a cost plus basis. Apparently Community had been counting on Talcott to finance the Levitt receivables when it signed this contract. However, Talcott refused. Levitt was thus put in the position of financing the Community operation. He made substantial cash advances during November and December of 1965 to enable Community to get into production, but the relations between Community and Levitt soon became strained.
 
 
 32
 Community's former president, Felix Hagerman, testified that Levitt 'became disenchanted with us * * * partly because of the production difficulties, and partly because of our insistence on additional funds for the units in accordance with the contract. He still would honor requests for funds but rather arbitrarily and occasionally after having told us that funds would be deposited to our account they weren't so deposited. * * * When that took place, of course, it created overdrafts and it created very serious problems.' He further testified that when production was finally begun in January of 1966, 'it was impossible to get up to the volume necessary to break even and there were resulting severe losses in January and February.'
 
 
 33
 At this time, Community opened the First City account in order to speed up the transfer of Levitt's funds from New York to Arthur. Mailing the funds had proved unsatisfactory to Community because in Hagerman's words, 'Our cash flow was so high that a difference of one day, two days could make a fantastic amount of difference in operations.'
 
 
 34
 It was during this period of increasing financial difficulty that Community drew more and more on funds which Hagerman knew were not available when the checks were drawn, but which were 'expected' to appear in time to head off the impending failure. All of the checks from which the losses here in question arose were drawn between March 8 and March 17, 1966.
 
 
 35
 On or about March 17, 1966, Community was notified that Decatur had ceased to honor uncollected checks drawn on Mattoon. Hagerman immediately went to Talcott in Chicago in an effort to secure funds to cover Community's overdrafts. Talcott, however, had apparently had enough. Since January, 1966, it had been holding all collections of Community's receivables, including the 15% Above its advances, in order to protect itself. It now refused to make any further advances for any purpose and froze the equities of Community it was then holding.
 
 
 36
 When Hagerman returned from Chicago to Sullivan, Illinois, Levitt was waiting for him. At this point, Levitt owed Community for one day's production under their contract, about $35,000.00 to $40,000.00, and Community needed $321,568.46 to cover its overdrafts. While there was no formal agreement that Levitt would cover Community's checks in excess of his obligations under the contract, Hagerman testified that Levitt had 'as a matter of practice' advanced funds on the basis of inventory in the plant in addition to receivables under the contract. However, at this time Community had only about half a million dollars of inventory and owed Talcott well over one million dollars under a blanket financing agreement covering all of its inventory.
 
 
 37
 According to Hagerman: 'Mr. Levitt, and it may have been justifiably, I don't know, refused to furnish any more funds under the circumstances * * * (and) was, frankly, afraid that all operations would be halted immediately, and he wasn't going to risk another dime of his money in the enterprise.'
 
 
 38
 The Ninth Circuit has said, quite aptly: 'The expectation of the defendant must, however, be more than mere hope. The circumstances must be such as to justify a reasonably certain belief that funds will be available (to pay the check in full when it is presented).' Williams v. United States, supra, 278 F.2d at 537. In the instant case, when Community issued its checks to Decatur drawn on Mattoon, its financial position was, as best, supported merely by hopes. It had not been able to fulfill its contract with Levitt. All of its assets were pledged and it was indebted in the amount of approximately two million dollars beyond its encumbered assets. Talcott had been 'putting the squeeze on' since at least January. Levitt, the much relied upon hope of Community, had not fulfilled its expectations to cover its overdrafts. Finally, Community conceded that it knew a delay of one or two days in securing funds from Talcott or Levitt 'could make a fantastic amount of difference in operations.'
 
 
 39
 In short, Community was in that state of collapse, perhaps best described as 'hopefully insolvent,' where the ever-optimistic businessman hopes that all can still be salvaged if the crumbling structure can be held together for just a few days longer. This hopeful insolvency normally gives way to the hopeless variety and the final efforts of the sagging enterprise most often add nothing to the estate but increased claims. When, as in the instant case, those final efforts include heavier and heavier 'kiting' of checks between banks in an attempt to meet ever increasing daily demands for ready cash, we are driven to the final conclusion that INA has failed to rebut the statutory presumption that Community had the requisite wrongful intent in issuing such checks.
 
 
 40
 In sum, under the circumstances present here, we conclude that Community's activities have been shown to fall within the scope of the Illinois criminal statute and thus within the coverage of the subject Bankers' Blanket Bond. As the Supreme Court of Illinois said in People v. Martin, 372 Ill. 484, 486, 24 N.E.2d 380, (1939): 'Broadly stated, any designed misrepresentation of an existing condition by which a party obtains goods of another, is a false pretense under the statute making it a crime to obtain property by false pretenses.'
 
 
 41
 The judgment of the district court is affirmed.
 
 
 42
 Affirmed.
 
 
 
 [1]
 Founded in the late 1800's as the Church of Jesus Christ, informally known as Harshmanites
 
 
 [2]
 See also Indemnity Insurance Company of North America v. Pioneer Valley Savings Bank, 8 Cir., 343 F.2d 634, 652-653 (1965); United States for Use of First Continental National Bank v. Western Contracting Corp., 8 Cir., 341 F.2d 383, 390-391 (1965); Altenburg, supra, 216 F.2d at 304; and Paulding, supra, 131 F.Supp. at 123-124. INA argues that one case is contra, Citizens National Bank of St. Petersburg v. Travelers Indemnity Co., 296 F.Supp. 300 (M.D.Fla.1967). However, the report of that decision consists only of a brief statement of findings of fact and conclusions of law and does not reveal anything about how the loss was caused. We do not consider this case authority one way or the other on the issues now before us
 
 
 [3]
 Aetna Casualty and Surety Co. v. Guaranty Bank and Trust Co., 1 Cir., 370 F.2d 276 (1966); Pioneer Valley, supra; Western Contracting, supra; Altenburg, supra; Hartford, supra; Merchants-Produce Bank v. United States Fidelity and Guaranty Co., 305 F.Supp. 957 (W.D.Mo.1969); and Paulding, supra
 
 
 [4]
 There can be no doubt that Section 17-1 is the relevant Illinois statute. As indicated hereinabove, the Committee Comments indicate that it covers the offense formerly labeled 'false pretenses' in the Illinois statutes. See also, Western Contracting, supra, 341 F.2d at 388-389
 
 
 [5]
 Ill.Rev.Stats., 1961, Ch. 38, Sec. 255
 
 
 [6]
 Cf. People v. Samples, 80 Ill.App.2d 182, 224 N.E.2d 284 (1967), cited by INA. See also People v. Greene, 92 Ill.App.2d 201, 235 N.E.2d 295 (1968); People v. Johnson, 91 Ill.App.2d 378, 233 N.E.2d 574 (1968); and People v. Billingsley, 67 Ill.App.2d 292, 213 N.E.2d 765 (1966)