THE UNION BANKING CO., APPELLEE, *v.* UNITED STATES FIDELITY & GUARANTY CO., APPELLANT.

[Cite as Union Banking Co. v. U. S. F. & G. Co., 4 Ohio App. 2d 397.]

(No. 855—Decided December 21, 1965.)

*Mr. Raleigh P. Swanner* and *Mr. C. Richard Fox,* for appellee.

*Messrs. Haynes & Sontich* for appellant.

JOHNSON, P. J. This is an appeal on questions of law from a judgment of the Court of Common Pleas of Columbiana County in the amount of $14,093.72 against the defendant-appellant, United States Fidelity & Guaranty Company.

The action was filed by the plaintiff, The Union Banking Company, against the United States Fidelity & Guaranty Company, defendant, and reference herein will be made to the parties as they appeared in the trial court.

The facts in substance are as follows:

The defendant issued to the plaintiff its "Banker's Blanket Bond, Standard Form No. 24, No. 54747-02-4086-51," revised to June 11, 1951. Subsequently the limit of liability under insuring clause (E) was increased from $10,000 to $25,000.

The pertinent provisions of the bond applicable to the facts in the instant case are as follows:

"Securities

"(E) Any loss through the Insured's having, in good faith and in the course of business, * * * extended any credit * * * on the faith of * * * any securities, documents or other written instruments which prove to have been counterfeited or forged as to the signature of any maker, drawer, issurer, endorser, assignor, lessee, transfer agent or registrar, acceptor, surety or guarantor or as to the signature of any person signing in any other capacity, or raised or otherwise altered or lost or stolen, or through * * * having * * * guaranteed in writing or witnessed any signatures, * * * in connection with any securities, obligations or other written instruments and which pass or purport to pass title to such securities, obligations or other written instruments; * * *.

"Exclusions

"Section 1. This bond does not cover:

"* * *

"(d) Any loss the result of the complete or partial nonpayment of or default upon any loans made by or obtained from the Insured, whether procured in good faith or through trick, artifice, fraud or false pretenses, except when covered by Insuring Clause (A), (D) or (E)."

The plaintiff, in the course of its business, extended credit to Valley Motor Sales and Service, Inc., an Ohio corporation of East Palestine, Ohio, from December 1960, to and including April 4. 1963, upon the faith of certificates of title for automo-

biles presented to it by one Robert H. Grove, president of Valley Motor Sales and Service, Inc. It was ultimately discovered that the certificates as presented were fraudulent.

The problems arising in this case are a result of Grove's fraudulent actions. While there were variations in individual instances, the general scheme followed was as follows:

Valley would receive shipments of new automobiles from the manufacturer. Each automobile, pursuant to Ohio statutes, was accompanied by a manufacturer's certificate, which is the document from which titles to new automobiles originate under Ohio statute. (See Section 4505.05, Revised Code.)

Grove would then take the new car, along with the manufacturer's certificate, and exchange it for a car owned by a dealer in a state other than Ohio, which did not have a certificate of title law. From that dealer, Grove would get another new car and a bill of sale, both of which would be brought back to Ohio. He would then take the bill of sale to the Clerk of the Common Pleas Court of Columbiana County, and with it obtain a certificate of title to the automobile. At a later time, frequently only a matter of a day or two, he would return to the clerk of courts, file an affidavit that the first title to the automobile had been lost, and obtain a duplicate title pursuant to Section 4505.12, Revised Code. On occasion he would repeat the latter procedure and obtain a second duplicate certificate of title.

Grove would then take these various certificates and duplicate certificates of title to area lending institutions and pledge them as security for loans. Having two or more titles for each automobile, he was able to obtain two or more loans on each car, and each loan was for nearly the full value of the car.

Some of the lending institutions failed or neglected to have their liens noted on the certificate of title, as provided by Section 4505.13, Revised Code, but instead merely kept them in their loan file. By their failure to comply with the statutory plan, they enabled Grove to continue his fraudulent scheme which otherwise would have come to light because of the provisions of the Ohio Certificate of Title Law. Section 4505.13, Revised Code, provides that when a clerk of courts notes a lien upon the certificate of title he shall also make a notation of the lien upon the copy of the title which he retains in his files, and shall notify the Registrar of Motor Vehicles, who maintains in-

dexed files on all cars titled throughout the state. (See Sections 4505.02, 4505.12, 4505.08, and 4505.13, Revised Code.) Had the items been noted on the copy of the original certificate of title, it would have been immediately apparent, when Grove returned to the clerk of courts to acquire a duplicate certificate, or when a second lienholder sought to have his lien recorded, that the original title was not lost but that, instead, Grove was using the several titles to pyramid loans.

The plaintiff herein did note its liens on the duplicate certificates, as required by Section 4505.13, Revised Code.

It is clear that when the original applications for the duplicate certificates involved in the instant case were made and signed by Grove, he knew that the statement therein that the originals were either lost or destroyed was false, and he made it with the intent to obtain duplicate certificates of title and to use the duplicates to defraud the plaintiff by using the same to obtain a loan.

Grove was indicted under Section 4505.19 (E), Revised Code, for "making a false statement in an application for a certificate of title." He pleaded guilty and was sentenced to the penitentiary. He was not prosecuted under the forgery statute, Section 2913.01, Revised Code.

The plaintiff originally presented its claim to the defendant for losses resulting from Grove's fraudulent scheme, and involving twelve automobiles. Ultimately this claim was reduced to cover only eight vehicles, which claim is summarized by the trial court in its opinion as follows:

"Summary—Union Bank -vs- U. S. F. & G.

| "Case | Original Amt. of Loan | Payment | Bal. of Prin. as of 10-11-61 |
|-------|----------------------|---------|------------------------------|
| No. 1 | $ 3,100.00 | $ 515.00 | $ 2,585.00 |
| No. 3 | 3,100.00 | 309.00 | 2,791.00 |
| No. 4 | 3,500.00 | 236.00 | 3,264.00 |
| No. 5 | 3,500.00 | 108.00 | 3,392.00 |
| No. 7 | 3,050.00 | -o- | 3,050.00 |
| No. 10 | 3,150.00 | -o- | 3,150.00 |
| No. 11 | 2,700.00 | 89.98 | 2,610.02 |
| No. 12 | 3,100.00 | 103.30 | 2,996.70 |
| | $ 25,200.00 | $ 1,361.28 | $ 23,838.72" |

Upon trial to the court, a jury having been waived, the court found for the plaintiff in the principal sum of $23,838.72, with interest at the rate of six per cent from the 11th day of October 1961. The court's findings of fact and conclusions of law are set out in its opinion.

After the trial and after the opinion had been dictated, but before any journal entry had been filed, counsel for the defendant requested the trial court to reopen the case so that defendant might introduce evidence which was not available at the time of trial. This motion was granted.

At the rehearing, it was shown that a bankruptcy proceeding involving Valley Motor Sales and Service, Inc., had been instituted in the United States District Court, wherein the plaintiff had presented its claims, as a preferred creditor, to the referee. As pointed out by Judge Kalbfleisch in his unreported opinion in Bankruptcy Case No. 95946, at page 5:

"The referee held that these liens, each of which was properly noted in accordance with Section 4505.13, Ohio Revised Code, upon a duplicate title which was clearly marked 'duplicate,' were void because the titles upon which they were based were void *ab initio,* having been procured by fraud. With that conclusion the court does not agree."

The Bankruptcy Court went on to hold that as to cars numbered 1, 3 and 4 (as listed in the trial court summary), the Union Banking Company did have a good and valid first lien *as against the claim of the trustee* and was entitled to the proceeds of the sale of such cars.

As to car number 7 (as listed in the trial court summary), Judge Kalbfleisch held that the trustee in bankruptcy had no lien or interest in such car superior to that claimed by the Union Banking Company, or to that claimed by Associates Discount Corporation.

Subsequently, the Union Banking Company and the Associates Discount Corporation settled the validity and priority of the lien between themselves, and the net proceeds of the sale were then divided equally between these claimants.

On rehearing, the trial court made a summary as to automobiles 1, 3 and 4 as follows:

402

| "Car No. | Gross Sales Price 8-31-61 | 15% Expense of sale | Net Proceeds of Sale | Bal. of Prin. on loan as of 10-11-61 |
|---|---|---|---|---|
| 1 | $ 2,525.00 | $ 378.75 | $ 2,146.25 | $ 2,585.00 |
| 3 | 2,300.00 | 345.00 | 1,955.00 | 2,791.00 |
| 4 | 2,750.00 | 412.50 | 2,337.50 | 3,264.00 |
| | $ 7,575.00 | | $ 6,438.75 | $ 8,640.00" |

As to cars numbered 1, 3 and 4, the trial court allowed the sum of $8,640 as an offset against the original judgment. As to car number 7, as to which there was a question as to plaintiff's title, the trial court allowed a satisfaction of but $1,105 (the amount actually received). The court thus reduced its original finding of $23,838.72 by $9,745 to $14,093.72, and awarded judgment in that amount.

Defendant has appealed from this finding and judgment of the trial court.

The plaintiff has filed its cross-appeal, contending that the court erred in reducing its judgment from $23,838.72 to $14,-093.72, but rather should have reduced its judgment by the amounts actually received from cars numbered 1, 3, 4 and 7, i. e., $7,544, rather than the balance due on the principal of the loan of $9,745, and that the correct reduced judgment should be $16,294.72 with interest.

The cross-appeal claims also that the trial court should have found that the plaintiff had coverage not only as to "instruments which prove to have been counterfeited," which was the holding of the trial court, but also coverage as to "instruments which proved to have been forged as to the signature of the maker."

So far as the author can determine, the issues raised are matters of first instance in the courts of Ohio. Though the type of bond at issue is in wide use, there appears to be a dearth of litigation in Ohio as to its construction.

In considering both the appeal and the cross-appeal filed herein, there is but one substantive question which needs to be decided. Recovery is only possible by reason of the provisions of subsection (E) of the bond. A construction of the pertinent

provisions of this section will be dispositive of all errors assigned. The relevant wording of subsection (E) is as follows:

"Securities

"(E) Any loss through the Insured's having, in good faith and in the course of business, * * * extended any credit * * * on the faith of any *securities, documents or other written instruments which prove to have been counterfeited or forged as to the signature of any maker,* * * *." (Emphasis added.)

At the outset it must be stated that it is clearly demonstrated by the bill of exceptions that the plaintiff did sustain losses on loans made on the vehicles previously noted, by having in good faith extended credit to the applicant, Valley Motor Sales and Service, Inc., on the basis of Valley's fraudulent representations.

The problem is thus reduced to an inquiry as to whether or not certificates of title, whether original or duplicate, come under the classification of *"securities, documents or other written instruments"*; and if so, whether such certificates of title were *"counterfeited or forged as to the signature of any maker"* as required for indemnification by the terms of the bond.

As to the first question: A large percentage of the business done by the banking community arises out of the financing of automobiles. A certificate of title obviously is not a security as contemplated in the bond.

Black's Law Dictionary, Fourth Edition, states that a security is "'protection; assurance; indemnification," and that "the term is usually applied to an obligation, pledge, mortgage, deposit, lien, etc., given by a debtor in order to make sure the payment or performance of his debt, by furnishing the creditor with a resource to be used in case of failure in the principal obligation."

Obviously, a certificate of title cannot qualify under such definition as a "security." It does not by itself convey a lien to a lending bank. Rather, the obligation of a borrower, though noted on the certificate of title, is evidenced by a *promissory note secured by a chattel mortgage.*

Can a certificate of title qualify as a "document or other written instrument"? Defendant would urge that under definitions to be found in the various sections of the Uniform Com-

mercial Code (Sections 1309.01 (7), 1301.01 (O), 1303.03), the words should be given the narrow connotation therein found.

With this argument we cannot agree. The terminology used in the bond was the sole choice of the defendant, which is well aware of the various written instruments which are presented to a lending institution for the purpose of procuring credit, one of the most common of these being the certificate of title to an automobile. The terminology, "documents or other written instruments," is, in our judgment, sufficiently broad as to encompass a certificate of title. As was stated by the Supreme Court of Ohio in *Butche* v. *Ohio Casualty Ins. Co.*, 174 Ohio St. 144:

"2. Where a policy of insurance prepared by an insurer provides generally for a certain coverage, exclusions from such coverage must be expressly provided for or must arise by necessary implication from the words used in the policy.

"3. Policies of insurance, which are in language selected by the insurer and which are reasonably open to different interpretations, will be construed most favorably for the insured."

We now turn to the question of whether or not the various duplicate certificates of title upon which loans were made by the plaintiff were proved to have been "counterfeited or forged as to the signature of any maker."

A number of Federal District and Circuit Courts have construed the above phrase.

The primary authority relied upon by the trial court is the case of *Fidelity Trust Co.* v. *American Surety Co. of N. Y.* (3d Cir.) 268 F. 2d 805, wherein the court said at page 807:

"Both sides have referred us to many dictionary definitions of 'counterfeit.' Dictionary definitions are useful, of course. But in a business transaction we think that the use of the words is to be taken in accordance with common business usage as much as possible. We think that common usage would indicate that counterfeit is something that purports to be something that it is not. And that is just what these spurious invoices were. They looked all right even as to details but they were not what they seemed to be."

Subsequently, the reasoning in *Fidelity Trust Co.* v. *American Surety Co.* (3 Cir.), 268 F. 2d 805, was applied by the District Court in the case of *First National Bank of South Caroli-*

*na of Columbia* v. *Glens Falls Ins. Co.,* 197 F. Supp. 264, which was appealed to the Fourth Circuit Court. The Circuit Court in 304 F. 2d 866, rejected the reasoning of the District Court, and in so doing said at page 869:

"The meaning of the contract in the case at bar seems to us to be plain. Protection is afforded to the insured against loss incurred by extending credit on a written instrument that is found to have been counterfeited or forged as to signature. There is no comma after the word 'counterfeited' and no other indication that the phrase does not qualify both terms of evil import; and there is positive indication that *it is the counterfeited or forged signature to the fraudulent document rather than false statements in the document or the falsity of the document in its entirety which alone gives rise to the liability of the insurer."* (Emphasis added.)

The reasoning of *Fidelity Trust Co.* v. *American Surety Co.,* 268 F. 2d 805, is also rejected in *State Bank of Popular Bluff* v. *Maryland Casualty Co.,* 289 F. 2d 544, and *North Carolina National Bank* v. *United States Casualty Co.,* 317 F. 2d 304. The majority of courts which have encountered this problem as it applies to fictitious invoices or accounts receivable (in those instances where the signature of the defrauder was genuine) have not considered such documents *counterfeit* within the meaning of insuring clause (E) of the bond. There appears to be general agreement that the word, *"counterfeit,"* as used *means an imitation of a genuine document having a resemblance intended to deceive and be taken for the original.*

For holdings to this effect generally see: *Exchange National Bank of Olean* v. *Insurance Co. of North America* (2d Cir. 1965), 341 F. 2d 673; *State Bank of Popuar Bluff* v. *Maryland Casualty Co.* (8th Cir., 1961), 289 F. 2d 544; *First National Bank of Memphis* v. *Aetna Casualty and Surety Co.* (6th Cir., 1962), 309 F. 2d 702, cert. denied 372 U. S. 953 (1963); *United States Fidelity and Guaranty Co.* v. *First National Bank of Fort Morgan* (1961), 147 Colo. 446, 364 P. 2d 202; *Metropolitan Nat. Bank of Minneapolis* v. *National Surety Co.* (D. C. Minn. 1931), 48 F. 2d 611.

We would again stress that a document or writing is counterfeit if it is an imitation, *i. e.,* if an attempt has been made to simulate another document which is genuine. However, the

certificates of title in this case arise not from imitation, but rather from a false representation of fact to the clerk of courts in the applications filed therein.

Plaintiff urges in its cross-appeal that the duplicate certificates of title fraudulently and falsely procured were under the Ohio Criminal Law (Section 2913.01, Revised Code) forgeries as to signature. The pertinent provisions of this statute are as follows:

"No person, with intent to defraud shall falsely make, alter, forge, counterfeit, print, [a] * * * check * * * or, with like intent, utter or publish as true and genuine such false, altered, forged, counterfeited, falsely printed, * * * matter, knowing it to be false, altered, forged, counterfeited * * *.

"Whoever violates this section is guilty of forgery * * *."

As authority for its position, plaintiff cites *State* v. *Havens,* 91 Ohio App. 578, and *In re Clemons,* 168 Ohio St. 83, in which the Supreme Court of Ohio, quoting Judge Fess in the *Havens case,* said at page 88:

" 'We, therefore, * * * hold that under Section * * * [2913.-01, Revised Code], a person is quilty of the false making of a check where the check is drawn upon a bank in which the maker has no funds or deposit account and is calculated to induce another to give credit to it as genuine and authentic, even though such person *signed his own name thereto* and likewise that one who utters such a check [with knowledge of its falsity] is guilty of forgery.' " (Emphasis added.)

It must be conceded that the definition of forgery as set out in that statute is far broader than what was understood at common law. As was stated by Judge Taft in his dissent at page 89 of the *Clemons case:*

"Of course the General Assembly can specify that certain elements will constitute the crime of forgery, even though such elements would not have amounted to forgery at common law."

The *Clemons case* has been subsequently approved in a *per curiam* opinion in *Dunham* v. *Maxwell, Warden,* 174 Ohio St. 184, as to an identical state of facts.

Under the rulings in the above cited cases, it is arguable that an analogy could be drawn that the acts of Groves in *making applications for duplicate certificates of title* constitute a forgery under the statute, provided, however, an application

for a duplicate certificate of title is deemed to be included in the classification of "documents" therein set out. But for purposes of this opinion we need not decide that question. Even if it be conceded, arguendo, that such acts constituted forgery under the statutory definition, we are here concerned with different wordage. While the *applications* for duplicate certificates of title would then constitute forgeries, they were not, and cannot be found to be, forged *as to signature*.

The plaintiff did not rely on the false applications presented to the clerk of courts. In fact, plaintiff never saw them. Plaintiff relied on the duplicates of certificates of title which were presented to it, and upon which it made loans.

To have been a forgery as to signature under the provisions of this bond *the signature of the Clerk of Courts of Columbiana County* on the duplicate certificates of title would have had to have been forged by Groves. Such was not the case. To hold otherwise would be such an interpretation as to give no effect to the phrase "as to the signature" as used in the bond.

We thus conclude that by virtue of the provisions of defendant's Banker's Blanket Bond, Standard Form No. 24, No. 54747-02-4086-51, as amended, Subsection (E) therein does not provide coverage under the facts of the instant case. Neither the applications filed with the clerk of courts nor the duplicate certificates of title on which the plaintiff relied were "counterfeited or forged as to the signature of any maker."

It seems clear to us that the facts show a loss resulting from a default on a loan procured "through trick, artifice, fraud, or false pretenses," liability for all of which is expressly excluded under Section I (a) of the bond.

For the reasons assigned the judgment of the trial court is reversed.

*Judgment reversed.*

JONES and LYNCH, JJ., concur.