SNYDER NATIONAL BANK, Plaintiff,

v.

WESTCHESTER FIRE INSURANCE COMPANY, Defendant.

Civ. A. No. CA 3–1667.

United States District Court
N. D. Texas,
Dallas Division.

Dec. 27, 1968.

Jenkens, Anson, Spradley & Gilchrist and Thomas W. Luce, III, Dallas, Tex., for plaintiff.

Bailey, Williams, Weber & Allums, James A. Williams, Dallas, Tex., for defendant.

## OPINION

WILLIAM M. TAYLOR, Jr., District Judge.

Plaintiff Bank seeks recovery on a Banker's Blanket Bond issued by Defendant Insurance Company to plaintiff. The question is whether or not plaintiff's loss incurred as a result of extending credit upon the basis of a forged telegram is covered by the bond. The facts have been stipulated and both parties have filed motions for summary judgment.

From the stipulated facts it appears that on August 19, 1965, Mrs. Virginia L. Garrison, acting in behalf of herself and her husband, made application to plaintiff for a 90-day loan of $20,000.00 to be used for purchasing a franchise and inventory for a "Cobbs Florida Cupboard Store". At the time of making the application Mrs. Garrison exhibited to plaintiff's officer a list of stocks on a form from the Merrill Trust Company, Bangor, Maine. Mrs. Garrison represented to plaintiff's officer that the listed stocks were no longer in trust, that $50,000.00 worth of the stocks had already been sold, and that the other $50,000.00 worth were held by Merrill, Lynch, Pierce, Fenner & Smith, Inc. at its Miami Beach, Florida office for the purpose of sale for the Garrison account.

After due consideration of the value of the stocks, plaintiff agreed that it would make the loan upon the conditions that (1) the Garrisons instruct Merrill, Lynch to proceed to sell the stocks within the 90-day term of the prospective loan and to forward the proceeds from the sale of the stocks to plaintiff for the purpose of repaying the loans and advances made by plaintiff to the Garrisons, and (2) that Merrill, Lynch acknowledge to plaintiff receipt of such instructions and acknowledged to plaintiff the transfer, delivery and receipt of the stocks. Mrs. Garrison stated that she was agreeable to these conditions and the loan was approved by plaintiff's loan committee on the basis that the written advice from Merrill, Lynch acknowledging receipt of the instructions was in plaintiff's files before any sums of money were advanced on the loan.

On August 24, 1965, Mrs. Garrison presented to plaintiff a telegram which purportedly came from the Miami office of Merrill, Lynch, Pierce, Fenner and Smith, Inc. It read:

"EST = PAUL GARRISON = 1006 215 ST SNYDER TEX =

= LETTER ACKNOWLEDGED SECURITIES WHEN SOLD CHECK MADE PAYABLE TO PAUL GARRISON SENT TO SNYDER NATIONAL BANK SNYDER TEXAS =

= MERRILL LYNCH PIERCE FENNER & SMITH INC = MILTON J. SCHWARTZ 407 LINCOLN ROAD MIAMI BEACH, FLO."

Upon receipt of the telegram, the $20,000.00 loan was consummated. Later, and in reliance upon the telegram, plaintiff made a further loan to the Garrisons on October 19, 1965 in the sum of $7,000.00. Still another $7,000.00 loan was made on November 4, 1965, once again in reliance upon the telegram.

When by November 30, 1965, Plaintiff had received neither any proceeds from the sale of the stock from Merrill, Lynch nor a satisfactory explanation from the Garrisons as to why plaintiff had not received any such proceeds, plaintiff made inquiry by telephone of the Miami Beach, Florida office of Merrill, Lynch as to when the proceeds might be expected. Plaintiff was informed that Merrill, Lynch did not have possession of the subject stock on August 24, 1965, or any time thereafter. Plaintiff was further informed by Merrill, Lynch that the telegram was wholly false and that the name "Merrill Lynch Pierce Fenner and Smith Inc.", as shown on the telegram, was not authorized by Merrill, Lynch to be transmitted. Based on this information, plaintiff applied funds on deposit with it to the credit of the Garrisons in the amount of $5,555.34 as a payment upon the note dated October 19, 1965. A balance of $1,144.66 remained. All subsequent attempts at collection from the Garrisons have proved futile, and there remains $28,444.66, plus interest, as provided by the notes still owing.

Plaintiff, in accordance with Section 3 of the Bond, notified defendant of all the above stated facts. After notification and within six months after the discovery by plaintiff of the loss, defendant denied that the loss was covered by the Bond.

The controversy centers around the construction of coverage E of the Bond which, in pertinent parts, reads as follows:

"Any loss through the insured's having, in good faith and in the course of business, whether for its own account or for the account of others, in any representative, fiduciary, agency or other capacity, either gratuitously or otherwise, purchased or otherwise acquired, accepted or received, or sold or delivered, or given any value, extended any credit or assumed any liability, on the faith of, or otherwise acted upon any securities, documents or other written instruments which prove to have been counterfeited or forged as to the signature of any maker, drawer, issuer, * * * or as to the signature of any person signing in any other capacity. * * *"

Contending that the loss in question is not covered by Clause E of the Bond, Defendant relies upon the case of Rockland-Atlas National Bank of Boston v. Massachusetts Bonding & Insurance Co., 338 Mass. 730, 157 N.E.2d 239 (1959). In this case the bank had been presented with a supposedly authentic financial statement which in truth and in fact was not accurate as represented. The bank was also presented with a letter purportedly from an accountant stating that he had made an examination and that the statement of assets and liabilities, in his opinion, presented a fair position. Relying upon the information in the statement and believing that the copies of the existing financial statement were correct and that the accountant's letter was genuine, the bank paid out the funds later discovering that the statement was false, that the letter was false, and that the purported signature of the accountant was not made by him nor with his authority. The Massachusetts court held to the effect that had there been any intention to bring within the purview of the bond such writings as were sued upon it would have been a simple matter to have added the phraseology that made it possible for such coverage to occur. The Court saw no reason to extend or enlarge upon the ordinary dictionary definition of the word "instruments", and after reviewing the case in the light of that definition, denied recovery under Clause E.

A later case, First American State Bank v. Aetna Cas. & Surety Co., 25 Wis.2d 190, 130 N.W.2d 824 (1964), although not actually deciding the question of what "securities, documents, and other instruments" was intended to include, expressed some disagreement with the Massachusetts court. The Wisconsin court, in stating the question to be

"whether Clause E was intended to cover only those writings which have legal efficacy", made reference to the fact that invoices were the kind of writings "which are commonly relied upon in business or commercial transactions as evidence of debt or property rights" and were thus the subject of forgery under Wisconsin law.

The Massachusetts court, in *Rockland-Atlas*, seems to have applied a narrow construction to the words and terminology used in the Bond, and it is interesting to note that in *First American State Bank* the Wisconsin court has commended the question to the attention of the draftsman of the bond.

The issue of what constitutes a "document or other written instrument" was expressly dealt with by the court in Union Banking Co. v. U. S. Fidelity & Guaranty Co., 40 Ohio App.2d 397, 213 N.E.2d 191 (1965), and that court relied on the generally accepted rule of construction in insurance contract cases:

"3. Policies of Insurance, which are in language selected by the insurer and which are reasonably open to different interpretations will be construed most favorably for the insured."

In Fidelity Trust Company v. American Surety Co., 268 F.2d 805 (3d Cir. 1959), wherein the court held that duplicate invoices assertedly representing assigned accounts receivable, though unsigned, were "counterfeited" within the meaning of Clause E, and the court said:

"The form was offered as a contract by large professional surety companies who certainly know what they are doing. We cannot think that it has not been very carefully drafted or that the draftsman put in words to mean nothing. Furthermore, this language is that of the promisor who is doing professional business for a consideration. The bond contained in the record is a printed form submitted by the surety company. If there is doubt about the meaning of language under those circumstances, it is not to be resolved in favor of the one who chose the words and as a business transaction issued the bond to another.

"Its very term 'Blanket Bond' indicates that its coverage is to be wide and it is not unfair to interpret the document in this fashion. * * *

"Both sides have referred us to many dictionary definitions of 'counterfeit'. Dictionary definitions are useful, of course. But in a business transaction we think that the use of the words is to be taken in accordance with common business usage as much as possible. We think that common usage would indicate that counterfeit is something that purports to be something that it is not. And that is just what these spurious invoices were. They look all right even as to details but they were not what they seemed to be."

■ The telegram in question is a writing which is commonly relied upon in business or commercial transactions as evidence of debt or property rights. The telegram can be construed as Merrill, Lynch's acceptance, as agent, of the Garrison's offer to that firm to pay brokerage fees for their sale of stock and transmittal of the proceeds to Plaintiff Bank. It is well settled that a telegram may constitute such an acceptance. Woldert v. Arledge, 4 Tex.Civ. App. 692, 23 S.W. 1052 (Tex.Civ.App. 1893); Craven v. Escajeda, 280 S.W. 225 (Tex.Civ.App.—El Paso 1926); Panhandle Refining Co. v. Bennett, 13 S.W. 2d 923 (Tex.Civ.App.—El Paso 1929).

Judgment will be rendered for the plaintiff.