[Civ. No. 42638. First Dist., Div. Four. Aug. 24, 1978.]

HELEN HINKSON, Plaintiff and Appellant, v.
FIREMAN'S FUND INSURANCE COMPANY,
Defendant and Respondent.

**COUNSEL**

Severson, Werson, Berke & Melchior, Robert L. Lofts and Jan T. Chilton for Plaintiff and Appellant.

Fields, Gallagher & Bunim, Ron W. Fields and James E. Gallagher for Defendant and Respondent.

## OPINION

**CHRISTIAN, J.**—Plaintiff Helen Hinkson, assignee of a claim of Liberty National Bank (now the Chartered Bank of London), appeals from a judgment denying recovery on an indemnity bond which had been issued to the bank by respondent Fireman's Fund Insurance Company. We affirm the judgment.

### The Bond

On March 11, 1971, Fireman's Fund issued to Liberty National Bank a "Bankers Blanket Bond" on its Standard Form No. 24 (revised to April 1969). Under Insuring Agreement (E) of the bond, Fireman's Fund agreed to indemnify and hold the bank harmless for: "LOSS (1) through the Insured's having in good faith and in the course of business, whether for its own account or for the account of others . . . purchased or otherwise acquired, accepted or received . . . or given any value, extended any credit or assumed any liability, on the faith of, or otherwise acted upon, any securities, documents or other written instruments which prove to have been [¶] (a) Counterfeited or forged as to the signature of any maker, drawer, issuer, endorser, assignor . . . or as to the signature of any person signing in any other capacity . . . . [¶] The word 'counterfeited' as used in this Insuring Agreement shall be deemed to mean only an imitation of a security, document or other written instrument, as set forth in (a) above, which is intended to deceive or to be taken for an original."

Section 2(e) of the bond's "Exclusions" provides that "THIS BOND DOES NOT COVER: . . . (e) loss resulting from the complete or partial non-payment of, or default upon, [¶] (1) any loan or transaction in the nature of, or amounting to, a loan made by or obtained from the Insured, or [¶] (2) any note, account, agreement or other evidence of debt assigned or sold to, or discounted or otherwise acquired by, the Insured whether procured in good faith or through trick, artifice, fraud or false pretenses unless such loss is covered by Insuring Agreement (A), (D), or (E) . . . ."

### The Space Data Loan

Space Data Sciences Corporation (hereafter Space Data) was engaged in the business of printing technical literature and manuals, providing technical writing and drawing services, and supplying part-time technical personnel.

On March 5, 1970, the bank entered into an "Accounts Receivable Financing Agreement" with Space Data to secure upon Space Data inventory and accounts receivable, advances to be made by the bank. Under this financing arrangement, whenever Space Data delivered goods or services to its customers it was to send a copy of the purchaser's invoice to appellant bank which would credit Space Data with loan entitlement in an amount equal to 80 percent of the invoice amount. When Space Data received payments from its customers, it was to prepare a "Collection and Credit Schedule" showing the invoice against which the payment should be credited. The schedule and payments were then sent to the bank, which applied the payments against the outstanding loan balance and eliminated the paid invoices from the collateral base against which the loan was calculated.

In November 1971, Space Data's president and principal financial officer informed bank officials that Space Data had discovered a billing error of approximately $180,000. There had been a duplicate billing of $180,000 by Space Data to the Navy Printing and Publications Office which resulted in an overstatement of the actual amount of the accounts receivable assigned to the bank. The bank immediately began an audit of the accounts receivable pledged by Space Data to determine their accuracy and validity. This audit revealed that Space Data had transmitted to the bank several invoices showing amounts due which were not in fact then due and owing. The trial court determined that "these false accounts receivable fell into three general categories: (1) those created by Space Data and sent to [the] Bank as loan collateral without ever having been transmitted to Space Data's customers; (2) those submitted for work purportedly completed, [where] in fact such work had only been partially completed; and (3) those invoices in amounts greater [than] those actually billed to Space Data's customers . . . ."

The trial court concluded that invoices submitted to the bank by Space Data which contained false statements but were otherwise genuine were not "counterfeited" or forged within the meaning of the coverage provided by Insuring Agreement (E) of the bond. Thus, the trial court concluded: "Under the terms of the Bond, loss to the Bank as a result of the complete or partial nonpayment of any loan is excluded under Exclusion (e) unless coverage is afforded under Insuring Agreements (A), (D) or (E). No claim has been made under Insuring Agreements (A) or (D) by the Bank and there is no coverage under Insuring Agreement (E) and therefore Exclusion (e) applies."

The bank contends that the false invoices of Space Data constituted documents or other written instruments "which proved to have been counterfeited" within the meaning of Insuring Clause (E), and that the trial court erred when it determined that the loss was not covered under Clause (E) of the bond. The argument is that the word "counterfeited" is ambiguous and that any doubts as to its meaning must be resolved against the insurer (see *Century Bank* v. *St. Paul Fire & Marine Ins. Co.* (1971) 4 Cal.3d 319, 321 [93 Cal.Rptr. 569, 482 P.2d 193]; *New York Life Ins. Co.* v. *Hollender* (1951) 38 Cal.2d 73, 81 [237 P.2d 510]). Fireman's Fund contends that the word "counterfeited" is not ambiguous and in fact is specifically defined in the policy. It points out that "where the terms of the policy are plain and explicit, the court will indulge in no forced construction so as to cast a liability upon the insurance company which it has not assumed." (*New York Life Ins. Co.* v. *Hollender, supra,* 38 Cal.2d 73 at p. 81; see *Aas* v. *Avemco Ins. Co.* (1976) 55 Cal.App.3d 312, 321 [127 Cal.Rptr. 192].)

In cases involving similar bonds, where the term "counterfeit" was not specifically defined in the instrument, it has usually been held that the word is not ambiguous and that it means an imitation of an authentic document or writing intended to deceive and to be taken for the original. Fictitious invoices and accounts receivable, such as those involved here, have thus not been considered counterfeit within the meaning of Insuring Clause (E). (*Richland Trust Co.* v. *Federal Insurance Co.* (6th Cir. 1974) 494 F.2d 641; *Whitney Nat. Bk. of New Orleans* v. *Transamerica Ins. Co.* (3d Cir. 1973) 476 F.2d 632; *Maryland Casualty Co.* v. *State Bank & Trust Co.* (5th Cir. 1970) 425 F.2d 979; *Capital Bank of Chicago* v. *Fidelity and Casualty Co. of N. Y.* (7th Cir. 1969) 414 F.2d 986; *First Nat. B. & T. Co. of Oklahoma City* v. *United States F. & G. Co.* (10th Cir. 1965) 347 F.2d 945; *Exchange Nat. Bank of Olean* v. *Insurance Co. of No. Amer.* (2d Cir. 1965) 341 F.2d 673; *First Nat. Bank of Memphis* v. *Aetna Casualty & Surety Co.* (6th Cir. 1962) 309 F.2d 702; *State Bank of Poplar Bluff* v. *Maryland Casualty Co.* (8th Cir. 1961) 289 F.2d 544; *State Bank of Kenmore* v. *Hanover Ins. Co.* (1965) 49 Misc.2d 341 [267 N.Y.S.2d 672]; *Union Banking Co.* v. *United States Fidelity & Guar. Co.* (1965) 4 Ohio App.2d 397 [213 N.E.2d 191]; *First American State Bank* v. *Aetna Cas. & Sur. Co.* (1964) 25 Wis.2d 190 [130 N.W.2d 824]; *United States F. & G. Co.* v. *First Nat. Bank of Ft. Morgan* (1961) 147 Colo. 446 [364 P.2d 202].)[1]

---

[1]The leading case to the contrary, *Fidelity Trust Co.* v. *American Surety Co. of New York* (3d Cir. 1959) 268 F.2d 805, was overruled in the Third Circuit in *Whitney Nat. Bk.*

In *Union Banking Co.* v. *United States Fidelity & Guar. Co., supra,* 213 N.E.2d 191, the bank made loans on the basis of collateral consisting of duplicate certificates of title procured through false representations of fact in applications made by the borrower to the clerk of courts. The court held that clause (E) of the banker's blanket bond did not provide coverage under such facts. The court stated: "The majority of courts which have encountered this problem as it applies to fictitious invoices or accounts receivable (in those instances where the signature of the defrauder was genuine) have not considered such documents *counterfeit* within the meaning of insuring clause (E) of the bond. There appears to be general agreement that the word, *'counterfeit,'* as used means an *imitation of a genuine document having a resemblance intended to deceive and be taken for the original.*

"For holdings to this effect generally see: Exchange National Bank of Olean v. Insurance Co. of North America (2d Cir. 1965), 341 F.2d 673; State Bank of Poplar Bluff v. Maryland Casualty Co. (8th Cir., 1961), 289 F.2d 544; First National Bank of Memphis v. Aetna Casualty and Surety Co. (6th Cir., 1962), 309 F.2d 702, cert. denied 372 U.S. 953, 83 S.Ct. 951, 9 L.Ed.2d 977 (1963); United States Fidelity and Guaranty Co. v. First National Bank of Fort Morgan (1961), 147 Colo. 446, 364 P.2d 202; Metropolitan Nat. Bank of Minneapolis v. National Surety Co. (D.C.Minn. 1931), 48 F.2d 611.

"We would again stress that a document or writing is counterfeit if it is an imitation, i.e., if an attempt has been made to simulate another document which is genuine. However, the certificates of title in this case arise not from imitation, but rather from a false representation of fact to the clerk of courts in the applications filed therein.

"          .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"It seems clear to us that the facts show a loss resulting from a default on a loan procured 'through trick, artifice, fraud, or false pretenses,' liability for all of which is expressly excluded under Section I (a) of the bond." (213 N.E.2d at pp. 196-198. Italics in original.)

---

*of New Orleans* v. *Transamerica Ins. Co., supra,* 476 F.2d 632, which states that "counterfeited" connotes "spurious or imitative execution of a document as distinguished from the document's explicit or implicit misrepresentation of facts other than the genuineness of execution." (476 F.2d at p. 634; but see *United Pacific Insurance Co.* v. *Idaho First National Bank* (9th Cir. 1967) 378 F.2d 62.

Similarly, in *Exchange Nat. Bank of Olean* v. *Insurance Co. of No. Amer., supra,* 341 F.2d 673, the court held that invoices representing nonexistent transactions were not "counterfeit" within the meaning of insuring clause (E).

In the present case, the word "counterfeited" is specifically defined. Under Insuring Agreement (E), the bond states that "The word 'counterfeited' . . . shall be deemed to mean only an imitation of a . . . document . . . which is intended to deceive and to be taken for an original." This definition conforms to the construction given the word "counterfeited" in the above-cited cases as "*an imitation of a genuine document having a resemblance intended to deceive and be taken for the original.*" (*Union Banking Co.* v. *United States Fidelity & Guar. Co., supra,* 213 N.E.2d 191 at p. 196; italics in original.) As the trial court stated in its memorandum of decision: "Here we are not dealing with words that have not been defined. The Insuring Agreement contains a definition of counterfeit in clear and unambiguous language. . . .

"In the Court's opinion the invoices were not forged or counterfeited within the meaning of Insuring Clause 'E.' They were signed and issued by the person authorized to sign and issue them. Falsity lies in the representation of facts contained in the invoices and not in the genuineness of their execution.

"In the opinion of the Court the invoices fall within the provisions of Exclusion (e)."

The determination of the trial court is correct.

The judgment is affirmed.

Caldecott, P. J., and Good, J.,* concurred.

---

*Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.