**TWIN CITY FEDERAL SAVINGS & LOAN ASSOCIATION, Appellant,**

v.

**TRANSAMERICA INSURANCE COMPANY, Appellee.**

No. 19301.

United States Court of Appeals
Eighth Circuit.

July 25, 1969.

Bernard L. Balkin, of Achtenberg, Sandler & Balkin, Kansas City, Mo., for appellant.

Robert J. Mann, of McKenzie, Williams, Merrick, Beamer & Stubbs, Kansas City, Mo., for appellee, Donald G. Stubbs, Kansas City, Mo., on the brief.

Before MATTHES, MEHAFFY and LAY, Circuit Judges.

LAY, Circuit Judge.

Twin City Federal Savings & Loan Association (hereinafter Twin City) brought action under a blanket fidelity bond against Transamerica Insurance Company for certain losses arising out of monies advanced by Twin City to the Investment Corp. of Missouri during the years of 1960 and 1961. The funds were used by Woodridge Corp., as well as others, for the construction of homes in and about the Kansas City area. Losses arose when Investment Corp. became defunct and it was discovered that prior lien interests existed superior to those assigned to Twin City. Twin City brought action under its bond and moved for a summary judgment against

Transamerica. Coverage under the bond was denied by Transamerica, who likewise moved for summary judgment on the basis that the losses by Twin City arose out of "loans" specifically excluded under the bond. The issue was submitted to the trial court upon a stipulation of facts. The trial court, Honorable John W. Oliver, granted judgment in favor of the bonding company, finding that the money transactions were "loans" specifically excluded under the bond. Twin City appeals. We affirm.

On appeal it is basically alleged: (1) the exclusionary clause of the bond in reference to "loans" is ambiguous and under Missouri law the terms of the policy are to be strictly construed, most strongly against the insurer; (2) that there is either no evidence at all or at least insufficient evidence in the record to sustain a finding that there was a "loan" by Twin City; conversely, that the overwhelming evidence demonstrates that there was in fact a "sale" of credit rather than a "loan."

The facts may be briefly summarized. Twin City is a federally chartered savings and loan association organized and existing under 12 U.S.C. § 1461 et seq. In late 1960 it entered into negotiations with one Charles Hayes, vice president of Investment Corp., to extend "a line of credit" to certain construction companies for the erection of private homes. Investment Corp. was in the real estate mortgage brokerage business. According to the evidence its primary role was to set up a line of credit with different financing institutions, such as Twin City, in which money would be lent to various builders in order to finance construction of private homes. The primary builder was Woodridge Corp., which in 1960 was also owned by the sole stockholder of Investment Corp., Donald F. Roberts.

Money was obtained by Investment Corp. using two different methods. In one instance, Investment would give the lending institution their own promissory note secured by assignment of the individual notes of the construction builder which were made payable to Investment Corp. The second method was used in dealing with federally chartered building and loan companies, such as Twin City. Under this method, the monies were advanced by having Investment Corp. make a direct assignment to Twin City of the builder's notes *under a blanket agreement*, whereby Twin City "purchased" the notes of the builders outright.

In each instance the construction company would pay off the notes direct to the lending agency. The reason for handling the transfer of funds by assignment and purchase-discount (1 percent retained by Twin City) rather than by direct loan to Investment Corp. was to circumvent certain federal regulations which restricted building and loan associations to a 90 percent loan of the collateralized builder's notes in their lending operations. See 12 C.F.R. § 545.6–17. By use of assignment and purchase the building and loan association was able to advance up to 99 percent of the value of the builder's loans.

Twin City and Investment Corp. negotiated the terms of their agreement by the exchange of several drafts. The original drafts related to a direct collateralized loan, but because of the necessity of compliance with the federal regulations, a different mechanical procedure was evolved denoting an actual "purchase" rather than a loan. However, the various terms set forth in the *overall* final agreement [1] manifest the purpose

---

1. The agreement reads in part:
  "THIS AGREEMENT Made and Entered into by and between the TWIN CITY FEDERAL SAVINGS AND LOAN ASSOCIATION of Kansas City, Missouri, hereinafter referred to as the 'Association' and the INVESTMENT CORPORATION OF MISSOURI, a Missouri Corporation, here-

inafter referred to as the 'Corporation', and said parties agree as follows:

\*    \*    \*    \*    \*

  "2. In consideration of the deposits caused to be made by the Corporation, the Association agrees to extend to the Corporation a construction credit line \* \* \* and that said funds shall be borrowed by the Corporation within a

that all transactions were simply to extend financing by Twin City indirectly to the various building contractors.[2] as construction loans.

As mentioned, it was subsequently discovered that there existed prior liens on the properties in question and substantial losses were incurred by Twin City.

Twin City had a fidelity bond with defendant company which protected it from: "Any loss of Property through any other form of fraud or dishonesty by any person or persons, whether Employees or not." Excluded, however, from the above insuring clause is: "Any loss the result of the complete or partial nonpayment of or default upon any loan made by or obtained from the Insured, whether procured in good faith or through trick, artifice, fraud or dishonesty, except when covered by Insuring Clause 1 or 2."

Twin City urges that the word "loan" is ambiguous and should be construed favorably to the insured so as not to exclude the losses involved. In this regard, Twin City contends that this Circuit has conflicting decisions in Community Fed. Sav. & Loan Ass'n v. General Cas. Co. of America, 274 F.2d 620 (8 Cir.1960) (loan clause not ambiguous) and in Indemnity Ins. Co. v. Pioneer Valley Sav. Bank., 343 F.2d 634 (8 Cir. 1965) (loan clause ambiguous). Although the word "loan" might be defined in different ways, we do not agree

---

period of fifteen (15) to thirty (30) days from date of receipt thereof; * * * if such funds are not borrowed as herein agreed within such time then, the Association may lend said funds to other qualified borrowers. It is further understood and agreed that all credit extended shall be evidenced by notes and first deeds of trust on the property to be built on * * *.

"(a) * * * the Association shall have the authority to limit the number of loans that may be made to an individual contractor or builder as it may appear to the interest of the Association.

*     *     *     *     *

"(d) The Corporation shall * * * continuously keep itself in position to cover any borrowed funds loaned them by the Association * * *. The Corporation shall also have, in lieu of the above, the option to purchase back from the Association sufficient of its loans as to satisfy the Association.

"3. The Association agrees to purchase from the Corporation, with recourse only, promissory notes secured by first mortgage deeds of trust or real estate * * *.

"4. The Association agrees to purchase the promissory notes mentioned above at 99 per cent of their par value. * * *

"5. The Association will disburse funds due the Corporation under this agreement upon the furnishing to the Association by the Corporation of a blanket position Fidelity Bond in the minimum sum of $300,000.00, with the Association reserving the right to make inspection of the properties at anytime and to cancel this agreement at anytime the Association shall deem itself insecure.

"6. * * * the Corporation will see to it that the Association is furnished a completion bond on each transaction * * *.

*          *          *          *          *

"9. * * * the Association will not withhold its credit approval if the credit qualification of the maker or makers are in keeping with prudent lending practices in use by other lending institutions in the area."

Attached to the agreement is the completion bond. It reads in part:

"THE CONDITIONS OF THIS OBLIGATION ARE SUCH THAT, WHEREAS, the said obligee (at the request of principal and surety) has agreed to lend the sum * * *.

" * * * the principal and surety hereunder desire that the TWIN CITY FEDERAL SAVINGS AND LOAN ASSOCIATION pay from time to time money due by reason of above mentioned loan on said real estate * * *.

"NOW, THEREFORE, in consideration of the payment of said funds due under said loan * * *."

2. Testimony of Mr. Hayes:

"Q. That is to say Investment Corporation was not really lending its own money to Woodridge but was arranging lines of credit and making that available to Woodridge; is that right? A. Yes, that's correct." P. 211 of Record.

that it lends ambiguity to the clause itself nor does this fact necessarily aid the insured here.

The rule for construction of an insurance policy is well established. Mr. Justice Sutherland stated in Bergholm v. Peoria Life Ins. Co., 284 U.S. 489, 492, 52 S.Ct. 230, 231, 76 L.Ed. 416 (1932):

> "It is true that where the terms of a policy are of doubtful meaning, that construction most favorable to the insured will be adopted. * * * This canon of construction is both reasonable and just, since the words of the policy are chosen by the insurance company; but it furnishes no warrant for avoiding hard consequences by importing into a contract an ambiguity which otherwise would not exist, or, under the guise of construction, by forcing from plain words unusual and unnatural meanings."

See also Hartford Acc. & Indem. Co. v. Federal Deposit Ins. Corp., 204 F.2d 933, 937 (8 Cir. 1953), where Judge Sanborn reviewed a similar exclusion clause under Missouri law for this court by quoting additional language from *Bergholm,* supra, saying:

> " 'Contracts of insurance, like other contracts, must be construed according to the terms which the parties have used, to be taken and understood, in the absence of ambiguity, in their plain, ordinary, and popular sense.' Bergholm v. Peoria Life Ins. Co., 284 U.S. 489, 492, 52 S.Ct. 230, 231, 76 L. Ed. 416; State ex rel. Prudential Ins. Co. of America v. Shain, 344 Mo. 623, 627, 127 S.W.2d 675, 677.
>
> "It is not conceivable to us that any disinterested banker, insurance underwriter, or lawyer would construe the word 'loan', as used in the exclusion clause of this indemnity bond, to cover the obligation imposed by law to reimburse a bank for money or credit obtained through the use of worthless checks."

In the instant case, the end result does not turn upon any alleged ambiguity of the insurance policy itself. The sole question here is whether, under the facts involved and Missouri law, Twin City incurred a loss by making "loans." Both parties agree that Missouri law governs the transaction.

In Missouri the definition of a "loan" is established in early usury cases. The Missouri Supreme Court in Quinn v. Van Raalte, 276 Mo. 71, 205 S.W. 59, 67 (1918), adopts the definition of the New Jersey court in Freeman v. Brittin, 17 N.J.L. 191, where it was said:

> "It is not necessary in order to constitute a loan, that there should be in very terms an application to borrow or an agreement to lend. Every advancement of money for the accommodation of another, to be repaid to the person making the advance by the person receiving it, *or by any person for him,* or by or out of his funds, is literally and legally a loan of money." (Emphasis ours.)

See also Bank of Slater v. Union Station Bank, 283 Mo. 308, 222 S.W. 993, 996 (1920), where the court said:

> "To lend is to allow the custody and use of a certain thing, on condition of the return of the thing loaned, or, in the case of money, and perhaps other things, of its equivalent in kind. Webster's Dictionary; Century Dictionary; Anderson's Dictionary; Black's Dictionary; Words and Phrases, First Series, Vol. 5, p. 4196; Griffen v. Train, 40 Misc.Rep. 290, 81 N. Y.Supp. 977, loc. cit. 981."

Plaintiff urges that the terms of the contract between Twin City and Investment Corp. establish conclusively that the monies advanced were not loans but in fact purchases of credit and that therefore the exclusion is not applicable. However, we think it clear that the very language of the overall agreement as well as the completion bond attached, which speak in terms of "credit exten-

sion," "loan" and "borrowers," defeat this argument. And notwithstanding the mechanics of a "purchase" described in the contract itself, the overall agreement set forth, as well as the undisputed testimony, demonstrates that Investment was simply arranging extended credit for the building contractors. The Missouri court in General Motors Acceptance Corp. v. Weinrich, 218 Mo.App. 68, 262 S.W. 425, 428 (1924), has observed:

"[A] loan may be cloaked in the outward form and appearance of a purchase, *in which case that will not change the substance of the transaction* nor hide the usury. But if there is a real and bonafide purchase, not made as the occasion or pretext for a loan, the transaction will not be usurious even tho the sale be for an exorbitant price \* \* \*." (Emphasis ours.)

■ Plaintiff further urges its money transactions are not "loans" since Investment Corp. only had a conditional obligation to repay the notes by its endorsement of the notes "with recourse." Conversely, the insurer urges that an endorsement "within recourse" constitutes a guaranty of paper and as such demonstrates conclusive evidence of a loan. In some jurisdictions a third party endorsement "with recourse" is considered a sham if used for purposes of avoiding the effect of a loan to circumvent usury laws. See e. g., Associated Stores, Inc. v. Industrial Loan & Invest. Co., 202 F.Supp. 251 (E.D.N.C.1962). However, in Missouri, such an endorsement with recourse does not require a legal finding of a "loan" per se. Webster v. Sterling Finance Co., 355 Mo. 193, 195 S.W.2d 509 (1946); General Motors Acceptance Corp. v. Weinrich, supra. Nevertheless, under Missouri law, the mere use of an endorsement cannot otherwise successfully camouflage a loan as a "sale." In *Weinrich*, the Missouri Supreme Court stated:

"It is no doubt true that, where there is no sale in good faith, but a

mere loan, *the fact that the note is made to one person who, acting as a conduit, immediately indorses it over to a third person,* who advances the money, such procedure is not sufficient to evade the statute. That was the situation in Wilkie v. Roosevelt, 3 Johns. Cas. (N.Y.) [206] 66, where the note was made to one party who, without paying or receiving anything of value therefor, immediately indorsed it to one Goodrich for the purpose of being discounted at usurious interest." 262 S.W. at 429. (Emphasis ours.)

See also White v. Anderson, 164 Mo.App. 132, 147 S.W. 1122 (1912).

Analysis of Missouri cases demonstrates that each transaction turns upon the *good faith* of the parties to the transaction as to whether or not a *bona fide* sale was made or whether the agreement itself was merely a pretext for a loan. Anderson v. Curls, 309 S. W.2d 692 (Mo.App.1958); General Motors Acceptance Corp. v. Weinrich, supra; White v. Anderson, supra. See also In re Grand Union Co., 219 F. 353 (2 Cir.1914). The general rules relating to construction of a contract are set out by the Missouri Supreme Court in Paisley v. Lucas, 346 Mo. 827, 143 S.W.2d 262, 268 (1940), where the court said:

"For the purpose of determining the intention of the parties and reaching a construction that is fair and reasonable under all the facts and circumstances, the court may consider the relationship of the parties, the subject matter of the contract, the usages of the business, the surrounding facts and circumstances attending the execution of the contract and its interpretation by the parties."

With these guidelines we now turn to the findings of the trial court. The court found that the transactions were loans primarily because (1) all the negotiations leading up to the final agreement related to Investment Corp. obtaining construction loans for the building

companies, (2) the language of the overall contract itself related to an extension of a line of credit, (3) the mechanics followed by Twin City in advancing some of the amounts on the notes pursuant to a construction schedule rather than by a direct payment as in an outright purchase, (4) Investment acted as a conduit so that the construction companies could obtain the monies, (5) the testimony of the president of Twin City reflected that the money was being *loaned* to Investment, and (6) of other miscellaneous evidence relating to the corporate minutes of Twin City, the handling of the books, et al., relating to "loans."

■ The question of whether there was or was not a loan is a mixed question of fact and law. As we have discussed, the Missouri law recognizes that a purchase and discount of a note may nevertheless be a pretext for a loan and that the real issue must be resolved around the bona fide intent of the parties. The latter question is one of fact. The trial court found that the transaction was not a bona fide sale. As set forth, there is substantial evidence from the agreement itself to support this finding and such finding, of course, cannot be disturbed unless it is clearly erroneous.

■ The record conclusively shows that Investment was interested in obtaining a line of credit for the companies. Investment loaned no money itself. Investment transferred nothing or in any way sold anything of value to these construction companies.[3] It simply arranged an extension of credit for them. The sole purpose of the contract with Twin City was to effect the loans for the building companies.[4] The control over the paper purchased, the delayed payouts notwithstanding the terms of agreement, the very terms of the agreement itself along with the testimony of the parties all clearly reflect that the substance of the transaction was intended to be a loan, as defined under Missouri law. The circumvention of the federal regulations relating to collateralized loans is at best corroborative of the fact that the mechanics of purchase were mere pretext for what in reality was an extension of a line of credit to the builders, or in other words, a loan. No one disagrees that the purpose of the exclusionary clause was to avoid the risk of writing credit insurance. To sustain coverage here would be to write a different and new insurance contract, which we cannot do.

Judgment affirmed.

3. The facts of *Weinrich*, 262 S.W. 425 (Mo.1924), are noteworthy of comparison here. There the seller of the note involved in consideration for the sale of an automobile received the note which was then endorsed to the lender. The charge of usury was successfully defended against. The court found a bona fide sale rather than a loan and said:

"It is urged, however, that the terms of the indorsement are such as not only made Reuter guarantee the note, but also rendered him equally liable with the maker, and therefore the assignment was not a bona fide sale, but was a loan upon a collateral security of the evidence of debt. This ignores the unquestioned facts that there was a bona fide sale of the automobile out of which the note grew, and makes the question at issue depend not upon the bona fides of that sale, but upon the good faith of the sale of the note by Reuter to plaintiff." Id. at 429.

4. Cf. White v. Anderson, 164 Mo.App. 132, 147 S.W. 1122 (1912), where the court held a transaction to be a usurious loan and said:
"The transaction was no less than if plaintiff had gone to the store with defendant and then and there paid the merchant for the coat and taken defendant's note just as he did take it." Id. at 1123.