The FIRST NATIONAL BANK AND TRUST COMPANY, CHICKASHA, OKLAHOMA, Plaintiff-Appellee,

v.

The CONTINENTAL INSURANCE COMPANY, Defendant-Appellant.

No. 74–1160.

United States Court of Appeals, Tenth Circuit.

Argued Oct. 25, 1974.

Decided Jan. 10, 1975.

Rehearing Denied Jan. 29, 1975.

Certiorari Denied April 28, 1975.

See 95 S.Ct. 1681.

Kerry W. Caywood, Chickasha, Okl. (Park, Nelson & Caywood, Chickasha, Okl., on the brief), for plaintiff-appellee.

Ben A. Goff, Oklahoma City, Okl. (Rhodes, Hieronymus, Holloway & Wilson, Oklahoma City, Okl., on the brief), for defendant-appellant.

Before SETH, McWILLIAMS and BARRETT, Circuit Judges.

McWILLIAMS, Circuit Judge.

This is a dispute between an insurance company and its insured and the issue here to be resolved is whether a loss suffered by the insured, a bank, is covered by a bankers blanket bond. The insurance company defended on the ground that the loss incurred was a loan loss and, as such, an excluded risk. In a trial to the court, sitting without a jury, the trial court held that the loss suffered by the insured was not a loan loss, and that the loan exclusion was therefore inapplicable. Accordingly, the trial court entered judgment in favor of the insured and against the insurance company in a total amount of $175,871.81. The insurance company now appeals, contending that the entire loss was a loan loss, and as such an excluded risk. We agree. In our view the findings and conclusions of the trial court are not supported by the record and are clearly erroneous. In order to demonstrate such, the facts must be summarized in considerable detail.

The Continental Insurance Company, hereinafter referred to as the Insurer, issued a Bankers Blanket Bond, Standard Form No. 24, to the First National Bank and Trust Company, Chickasha, Oklahoma, hereinafter referred to as First National, which bond was in force and effect when First National suffered the losses here involved. The insuring provision under which First National, the insured, seeks to hold liable the Insurer reads as follows:

"(B) *Any loss of Property through* robbery, burglary, commonlaw or stat-

utory larceny, theft, *false pretenses,* hold-up, misplacement, mysterious unexplainable disappearance, damage thereto or destruction thereof, whether effected with or without violence or with or without negligence on the part of any of the Employees, and any loss of subscription, conversion, redemption or deposit privileges through the misplacement or loss of Property, while the Property is (or is supposed to be) lodged or deposited within any offices or premises located anywhere, except in an office hereinafter excluded or in the mail or with a carrier for hire, other than an armored motor vehicle company, for the purpose of transportation." (Emphasis added).

The bond further provides that there is no coverage of several excluded risks, one of which reads as follows:

"This bond does not cover:

\* \* \* \* \* \*

"(d) Any loss the result of the complete or partial non-payment of or default upon any loan made by or obtained from the Insured, whether procured in good faith or through trick, artifice, fraud or false pretenses, except when covered by Insuring Clause (A), (D) or (E)."

The loss, or losses, for which First National seeks recovery occurred on or around July 1, 1971, and arose out of First National's long business relationship with W. C. Francis & Sons, an automobile dealership in nearby Blanchard, Oklahoma, which company will hereinafter be referred to as Francis.

Francis was a Ford agency and dealt in new and used cars. As indicated, though First National's losses occurred during June and July 1971, it had been financing Francis for more than ten years prior thereto. Francis floor planned the purchase of its new automobiles through First National by borrowing money to pay Ford Motor Company, and in turn executing promissory notes in favor of First National, with the acquired vehicles being given as security for such notes. Many of the vehicles sold by Francis, be they new or used, were sold on the installment plan, and in connection therewith First National down through the years had purchased, with recourse, much commercial paper from Francis. Additionally, First National from time to time would simply loan money to Francis, which in turn would sign a note in favor of First National for the money thus loaned, giving collateral of various kinds as security. The foregoing illustrates the general nature of the business relationship between First National and Francis, which, as indicated, was of long standing, and over the years involved the advancing of considerable sums of money by First National. Francis maintained a checking account in First National and the loan proceeds were generally channeled into that account.

The Ford Motor Company insisted that Francis pay for new automobiles as they were delivered, which required Francis to have a cashier's check, or a certified check, in hand at the precise moment the new vehicles arrived. Francis was located in Blanchard, Oklahoma, somewhat removed from Chickasha, and this fact necessitated considerable travel back and forth between Blanchard and Chickasha by Francis in order that it might have a cashier's check to pay Ford Motor Company at the moment of a delivery. To minimize this inconvenience, in early 1969 First National and Francis decided that the latter should use its checking account in the First State Bank in Blanchard, hereinafter referred to as Blanchard Bank, to obtain the cashier's checks needed for payment of newly delivered cars. It was agreed that Francis would present to Blanchard Bank checks drawn by Francis on its checking account in First National. Such checks were to identify by serial number the particular vehicle for which the cashier's check was being given. On presentment of such a check, Blanchard Bank agreed to immediately give Francis a cashier's check in the amount of the deposit, and in turn First National guaranteed payment to Blanchard Bank of the checks thus drawn on it by Francis. This entire

arrangement was finalized in a letter dated January 24, 1969, sent by a vice-president of First National to Blanchard Bank, which reads as follows:

" * * * New Ford vehicles are shipped to this firm on a C.O.D. basis and they are required to pay the convoy transport driver with either a certified check or a cashiers check for the vehicles that are being delivered to them at that particular time. When the delivery of the vehicle is made after normal banking hours, the convoy driver is required to telephone ahead to allow enough time for the dealer to be able to get to the bank for a cashiers check.

"This firm in the past has presented checks to you for cashiers checks. The checks presented to you will bear a new Ford serial number on the check and you are requested to issue your cashiers check for their check payable to Ford Motor Company identifying by serial number the vehicle for which the check is intended. These checks have been drawn on their account in this bank. If you will be so kind as to honor their request of having this cashiers check issued by your bank on their check drawn on this bank, this bank will guarantee payment of these checks for new Ford vehicles bearing a Ford serial number on the check presented to you. * * * "

This arrangement between First National, Blanchard Bank and Francis went into effect in early 1969. It should be mentioned that not only did Francis use its account in Blanchard Bank to pay for newly acquired vehicles, but also drew on the account to pay for many of its day-to-day operating expenses.

Although Francis never did admit such, it would appear that soon after First National guaranteed payment of checks drawn on it by Francis, the latter began an extensive check kiting operation involving deposits and counter-deposits back and forth between its checking accounts in Blanchard Bank and First National. As illustrative of its check kiting proclivities, Francis would, for example, present for deposit in its account in Blanchard Bank a check drawn on its account in First National, where there were at the time insufficient funds to cover the check in question. The check thus presented bearing the serial number of a Ford motor vehicle, Blanchard Bank would immediately issue a cashier's check in the amount of the deposit. On other occasions a check drawn on First National but bearing a fictitious Ford vehicle serial number would merely be deposited in Francis' checking account, with no cashier's check being given in return therefor, and Blanchard Bank would then allow Francis to immediately draw checks on the amount so deposited.

To cover such withdrawals from its account in First National, Francis would simultaneously deposit a like amount in its account in First National in the form of checks drawn on its account in Blanchard Bank, and First National would allow Francis to immediately draw upon such deposit. As indicated, this check kiting operation apparently commenced in early 1970 and thereafter grew in volume until during the month of June 1971 there was approximately $800,000 in checks drawn on First National and deposited in the Francis account in Blanchard Bank, and an equivalent dollar value of checks drawn on Blanchard Bank and deposited in the Francis account in First National.

On June 29, 1971, examiners of the Federal Deposit Insurance Corporation alerted Blanchard Bank to the possibility of a check kiting operation. Because of insufficient funds in the Blanchard account, the examiners instructed Blanchard Bank to return, unpaid, Francis' checks drawn on Blanchard Bank and presented for payment by First National. On the same day, checks drawn on First National and negotiated at Blanchard Bank arrived at First National for payment. There were then insufficient funds in the Francis account for these items.

When First National was thus alerted to the possibility of a check kite, it called

in the Francis brothers, Rene and Harold, for an explanation. The Francis brothers denied check kiting or any other misconduct, and asserted they had ample security to cover all overdrafts. Because of such reassurances and because First National believed it was obligated on its letter of guaranty to Blanchard Bank, First National on June 30, 1971, credited $88,760.50 to the Francis account at First National to cover the overdrafts. This transaction was treated as a loan by all parties with Francis signing a note in that amount in favor of First National and with First National carrying the credit on its loan account books. It soon developed that this was not a sufficient amount to cover additional overdrafts in the Francis account and two days later, on July 2, 1971, First National loaned Francis an additional sum of $33,302.22 by crediting Francis' account with that amount, Francis again signing a promissory note. Both notes were accompanied by pledges of collateral which never materialized.

Francis paid only a very small amount on either of the aforesaid notes and later went out of business. After allowing certain credits and adjustments, the unpaid balance due on these two notes amounted to $121,324.38. Such sum, according to First National, is a loss caused by check kiting and represents a "loss of property through * * * false pretenses." Conversely, the Insurer contends that this was a loan loss and an excluded risk under Exclusion (d). The trial court found that this loss was the result of a check kite, rather than a bad loan, and that under the provisions of the blanket bond the Insurer was liable to First National for its loss. Since this sum represents the major part of the judgment ultimately awarded First National, the total judgment being $175,871.81, we shall first consider the problem of the nature of the loss.

Numerous courts have held that a check kite operation which results in a loss of money to a bank does constitute a "loss of property through false pretenses," as that phrase is used in a bank-

ers blanket bond of the type here under consideration. In so holding, these courts have rejected the argument that inasmuch as the depositor is himself legally liable to the bank, there is in reality a "loan" from the bank to the check kiter, and as such an excluded risk. *See,* for example, such cases as First National Bank of Decatur v. Insurance Co. of North America, 424 F.2d 312 (7th Cir. 1970); United States v. Western Contracting Corporation, 341 F.2d 383 (8th Cir. 1965); Fidelity & Casualty Company v. Bank of Altenburg, 216 F.2d 294 (8th Cir. 1954); and Hartford Accident & Indemnity Co. v. Federal Deposit Ins. Corp., 204 F.2d 933 (8th Cir. 1953).

Accordingly, under the authorities above cited, if the instant case involved a loss of property occasioned by a *pure* checking operation, First National would be entitled to recover under its blanket bond. The Insurer itself agrees that such would be the result if the ultimate loss was in fact caused by a check kite. The Insurer asserts, however, that the real cause of First National's loss was Francis' failure to repay the loan. We agree.

■ When First National was alerted to the possibility of a check kite scheme, the Francis brothers were called in for an explanation. Apparently the explanation was convincing, because First National immediately loaned Francis additional sums totaling $122,062.72, and credited Francis' checking account with that amount. In return for such advances, Rene and Harold Francis executed two separate promissory notes to First National, secured by pledges of their individual and personal assets. On such a fact situation, First National sustained no loss as a result of the check kite, as the overdrafts were covered, in effect, by First National itself, which in turn received the promissory notes of Francis in exchange for the advances thus made. The "loss" was incurred by First National when Francis later defaulted on its notes. This is clearly a bad loan loss, subject to the exclusion,

and the trial court erred in concluding to the contrary.

In this general connection it is interesting to note that when First National initially "uncovered" the check kiting scheme, it made no claim of a loss incurred as a result thereof. Rather than have its financial statement reflect such a bad check loss, it preferred to loan the amount of the overdrafts to Francis and then carry the latter's promissory notes in its loan accounts. That First National itself did not regard its loss as one resulting from a check kite and within the coverage of its bond is also evidenced by the fact that in a letter to the Insurer, dated August 9, 1971, the president of First National stated, "It would appear to me at this moment that the loss is ours unless civil liability can be established through legal action." The "civil liability" thus referred to was presumably against Francis, or Blanchard Bank, as there is nothing to indicate that First National was contemplating action against the Insurer. On the contrary, First National thought the "loss is ours."

■ First National's loss being occasioned by a bad loan, it is an excluded risk under Exclusion (d) of the bond. The fact that Francis may well have made false statements in securing the loan, and pledged fictitious or nonreachable collateral, does not alter the fact that the loan thus obtained comes within the Exclusion (d). As indicated, the exclusion provides that the bond does not cover any loss which results from complete or partial nonpayment of any loan made by the Insured, "whether procured in good faith or through trick, artifice, fraud or false pretenses." In short, the exclusion fits the facts of the instant case most precisely, i. e., a loan secured through fraud and deceit. For cases holding that a loan induced by extrinsic falsity, such as a pledge of nonexistent collateral, is within an exclusion clause of the type with which we are here concerned, see such cases as Bank of Southwest v. Nat'l Surety, 477 F.2d 73 (5th Cir. 1973); Maryland Casualty Co. v. State Bank & Trust Co., 425 F.2d 979 (5th Cir. 1970); East Gadsden Bank v. U. S. Fidelity & Guaranty Co., 415 F.2d 357 (5th Cir. 1969); and State Bank of Poplar Bluff v. Maryland Casualty Co., 289 F.2d 544 (8th Cir. 1961).

The remaining items of "loss" awarded by the trial court in its judgment were unrelated to the check kiting operations. The trial court concluded that three promissory notes, representing monies loaned Francis by First National and for which Francis executed promissory notes, did not come within the exclusion clause because they were part of the overall scheme to defraud First National and were in fact secured by nonexistent collateral. Under the authorities above cited, such fact, i. e., nonexistent or fictitious collateral, does not mean that a loan valid on its face is outside the terms of the exclusion. The balance due on these three notes totaled $27,475 and the trial court erred in awarding First National judgment for that amount.

■ The balance of the judgment, exclusive of the prejudgment interest allowed by the trial court, was in the sum of $5159.43, and represented installment contracts and notes executed by purchasers of cars from Francis, which commercial paper First National in turn purchased, with recourse, from Francis. In these cases, the collateral never originally existed or was sold and Francis never fully remitted the proceeds to First National. The trial court concluded that this was not a "loan" of money, but was simply the purchase of commercial paper. We do not agree. The officer of First National who was in charge of First National's myriad dealings with Francis candidly admitted that in purchasing, with recourse, these installment contracts and notes, First National was simply "financing the Francis brothers by buying paper" and that it was just as though it had loaned money to Francis and taken the latter's promissory note in exchange therefor. Such was but a part of First National's continuing financing of the Francis dealership. See Twin City Federal Savings & Loan v. Trans-

america Ins. Co., 413 F.2d 494 (8th Cir. 1969).

Though we have ourselves devoted considerable attention to the check kiting aspect of this case, we have done so only in an effort to demonstrate that the check kite is not really the crux of the case. As indicated, First National did not cease its dealings with Francis when warned of a check kite, but on the contrary proceeded to loan Francis a sum well over $100,000. The important aspect of this case is the fact that for some ten years First National had been financing the Francis dealership by making countless loans, in one form or another. And when the Francis dealership folded, First National was left with unpaid loans. Such loss was an excluded risk.

Judgment reversed and cause remanded with directions that the trial court enter a judgment in favor of the Insurer dismissing First National's action.